# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------X

ROBERT I. TOUSSIE,   Index No.   512570/2020

                Plaintiff,   COMPLAINT

   -against-

WILLIAMS & CONNOLLY, LLP,
JOSEPH G. PETROSINELLI,
DAVID A. FORKNER,
JONATHAN E. PAHL,
LUPKIN & ASSOCIATES, PLLC,
JONATHAN D. LUPKIN,
REBECCA C. SMITHWICK,

                Defendants.
------------------------------------------------------------------X

Plaintiff Robert I. Toussie ("Toussie" or "Plaintiff"), for his complaint against defendants Williams & Connolly, LLP, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, Lupkin & Associates, PLLC, Jonathan D. Lupkin and Rebecca C. Smithwick (sometimes collectively referred to as "Defendants"), alleges:

### Introduction

1. This is an action for legal malpractice brought by Toussie against his legal counsels, Williams & Connolly, LLP, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, Lupkin & Associates, PLLC, Jonathan D. Lupkin and Rebecca C. Smithwick in the action entitled "In the Matter of the Application of Robert Toussie and Michael Toussie v. Coastal Development, LLC and Richard Fields" filed in the Supreme Court of the State of New York, County of New York, under Index No. 650227/2016 which sought to compel an arbitration regarding the

1

Toussies' enforcement of their rights pursuant to a Participation Agreement between those parties dated September 1, 2000 and the Settlement Agreement dated February 10, 2006 (the "Coastal Litigation"). These law firms, and their respective attorneys, repeatedly represented themselves as having particular expertise in contract enforcement matters and were retained to protect Toussie's interests in the Coastal Litigation. As Toussie's counsel, the Defendants were responsible for, among other things, providing legal advice to Toussie in connection with the Arbitration proceedings and the judgment entered in the Coastal Litigation. Critical to carrying out this duty, the Defendants were responsible for properly advising Toussie regarding the enforcement of his rights pursuant to the Participation Agreement and the Settlement Agreement including, but not limited to, the repercussions of the entry of a Judgment on the enforcement Toussie's rights under the Participation Agreement and the Settlement Agreement. Toussie relied on the Defendants to employ their purported expertise in contract enforcement matters to provide expert legal advice concerning the effect that the entry of a Judgment in the Coastal Litigation would affect Toussie's ability to enforce same on the assets of Richard Fields and Coastal Developement, LLC and the priority that would be afforded the Judgment with regard to the multi-million dollar Note held by Stabilis Fund IV, LP through its' wholly owned subsidiary, SFIV SS-1, LLC.

2. Toussie's claim against the Defendants arises out of the Defendant's egregious negligence in performing their duties, including their failure to adequately advise Toussie regarding the effect that the entry of a judgment in the Coastal Litigation would have on the Toussie's ownership rights in the Participation Interest granted him under the Participation Agreement and the Settlement Agreement, the lack of priority the Judgment would have over the

2

secured debt owed by Richard Fields and Coastal Development, LLC to Stabilis Fund IV, LP and its' wholly owned subsidiary, SFIV SS-1, LLC and the ability of Toussie to enforce the Judgment against the assets of Richard Fields and Coastal Development, LLC given the junior secured status accorded to the Judgment to the secured debt owed by Richard Fields and Coastal Development, LLC to Stabilis Fund IV, LP and its' wholly owned subsidiary, SFIV SS-1, LLC. The Defendant's malpractice culminated in their arranging the entry of a judgment in the Coastal Litigation on July 17, 2017 (the "Judgment") which effectively terminated Toussie's Participation Interests in the Tranche B Payments paid to Coastal Development, LLC in which Toussie (and others) held a 11.7847% ownership interest and relegated Toussie's rights to that of a junior judgment creditor subject to the rights of a senior secured lender who asserts an $80 million priority over the Judgment which is secured by all the present and future assets of Coastal Development, LLC and Richard Fields and renders the Judgment, therefore, illusory, worthless and unenforceable. The Defendants had a duty and obligation as Toussie's counsel to identify the potential ramifications of entering the Judgment on the Toussie Participation Interest pursuant to the Participation Agreement and the Settlement Agreement and advise Toussie of the legal effect of same.

     3. The Defendants' failure to properly carry out their duties to Toussie is all the more egregious because the Defendants vigorously touted their special expertise in handling contract enforcement actions. That purported expertise led Toussie to retain the Defendants for the Coastal Litigation. However, in spite of the Defendants highly-promoted experience with contract enforcement litigation, the Defendants failed to properly advise Toussie of the effect the Judgment would have on Toussie's ownership rights in the Participation Agreement and failed to

advise Toussie that there was a senior secured lender who asserts an $80 million priority over all of the assets of Coastal Development LLC and Richard Fields (both present and future), which it knew or should have known existed, and which would render the Judgment illusory, worthless and unenforceable.

4. In failing to properly advise Toussie of the legal effect of the entry of the Judgment on Toussie's ownership rights pursuant to the Participation Agreement and Settlement Agreement and on Toussie's ability to enforce the Judgment given the superior lien of Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC on all of Richard Fields and Coastal Development, LLC's assets, both present and future, the Defendants, failed to exercise the care, skill, and diligence required of members of the legal profession.

5. As a direct and proximate result of the Defendants' malpractice, Toussie has suffered – and continues to suffer – substantial damages.

**Parties**

6. Plaintiff Robert Toussie is a resident of the County of Kings, State of New York.

7. Defendant Williams & Connolly LLP is a limited liability partnership, with its' principal office located at 725 Twelfth Street, N.W. Washington, D.C. 20005.

8. Defendants, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, are attorneys associated with Williams & Connolly, LLP and maintain a business address at 725 Twelfth Street, N.W. Washington, D.C. 20005.

9. Defendant Lupkin & Associates, PLLC is a professional limited liability company with its' principal office located at 80 Broad Street, Suite 1301, New York, NY 10004.

10. The Defendants Jonathan D. Lupkin and Rebecca C. Smithwick are attorneys

4

associated with Lupkin & Associates, PLLC and maintain a business address at 80 Broad Street, Suite 1301, New York, NY 10004.

### Jurisdiction and Venue

11. Jurisdiction is proper pursuant to CPLR § 301, because the Defendants regularly transact business, in the State of New York and because this action arises out of tortious conduct committed by the Defendants within the State of New York.

### Background

**I. Coastal and Fields hoped to develop two Seminole Hard Rock casino projects**

12. In 2000, Coastal Development LLC ("Coastal") and Richard Fields ("Fields"), along with another entity, Native American Development LLC ("NAD"), hoped to develop two Hard Rock branded casino projects in Florida on land belonging to the Seminole Tribe of Florida (the "Tribe").

13. Coastal and NAD formed an entity, Power Plant Entertainment LLC ("Power Plant"), which entered agreements with the Tribe to develop the casinos.

14. The agreements entitled Power Plant to certain casino revenues and profits.

**II. The Toussies invested $2.88 million in return for a participation interest to be paid into a separate bank account as the "property of the Toussies".**

15. On September 1, 2000, Claimants Robert and Michael Toussie (the "Toussies") and Coastal and Fields entered into a participation agreement (the "Participation Agreement").

16. The Participation Agreement obligated the Toussies to invest several million dollars into Power Plant for the purpose of enabling Coastal and Fields to develop the casinos.

17. Coastal in turn "s[old], transfer[red], grant[ed] and convey[ed] to the [Toussies] an

5

undivided 11.7647 percent participation interest" in all "distributions," as defined by the Participation Agreement, that Coastal receives from Power Plant or with respect to the casinos.

18. The Participation Agreement required that Coastal establish a segregated bank account into which Coastal would receive distributions and hold the Toussies' share for their benefit, as their property. Specifically, paragraph 6(b) states: "Within 30 days after the date hereof Coastal shall establish a separate bank account at a New York City bank into which all cash Distributions receivable by Coastal shall be deposited, from which all Distributions received by Coastal shall be disbursed, and into which no other funds shall be deposited. 11.7647% of the Distributions deposited in such account shall be for the account of the [Toussies] in respect of the Participation Interest and, accordingly, shall be the property of the [Toussies]."

19. On September 1, 2000, Fields executed a guaranty in which he personally guaranteed payment and performance of Coastal's obligations in the Participation Agreement.

20. In the guaranty, Fields promised to reimburse the Toussies for "any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by the [Toussies] in enforcing (other than wrongfully) this Guaranty[.]"

21. The Toussies paid Coastal $2.88 million, fulfilling their funding obligations.

### III. Coastal and Fields refused to pay the Toussies their share in 2004 and 2007

22. After the casinos opened, Coastal and Fields began receiving tens of millions of dollars of distributions but did not pay the Toussies.

23. When Fields and Coastal refused to pay the Toussies pursuant to the Participation Agreement, the Toussies filed a lawsuit against Coastal and Fields in the Supreme Court of the

State of New York, New York County under Index No. 04/601540.

24. The parties executed a settlement agreement on February 10, 2006, in which Coastal and Fields agreed to pay the Toussies more than $10.6 million constituting payments then due under the Participation Agreement (the "Settlement Agreement").

25. The Settlement Agreement contains a provision requiring the parties to resolve any further disputes regarding the Toussies' rights under the Participation Agreement via arbitration.

26. In April 2007, Power Plant and the Tribe resolved certain disputes between them through a settlement agreement (the "Seminole Settlement").

27. Pursuant to the Seminole Settlement Power Plant received a lump sum payment of $643,580,730.

28. The Seminole Settlement was structured as a loan, such that Power Plant would pay back the lump sum amount over time. To accomplish that, the Seminole Settlement re-allocated revenues from the Seminole casinos. Some revenues, called Tranche A, would be used to repay the loan. Other revenues, called Tranche B, would go to Power Plant.

29. The Tranche B payments paid to Power Plant from the Tribe are set at $925,000 per month.

30. The Tranche B payments have been paid to Power Plant from the Tribe every month since the Seminole Settlement went into effect.

31. The Tranche B payments are scheduled to continue to be paid to Power Plant from the Tribe until April 2029.

32. Coastal owns 45 percent of Power Plant, and $416,250 is 45 percent of the monthly Tranche B payments.

7

**IV. Coastal and Fields' financial situation began to deteriorate**

33. Coastal and Fields began using debt to finance Fields's luxury lifestyle. They bought homes in New York City, Westchester County, and Miami; property in Texas; and both a home and ranch in Wyoming. They bought thoroughbred horses and two Gulfstream airplanes. Id. (a "G-1159A Aircraft" and "GIV Aircraft").

34. Soon, however, they could not keep up with their obligations. Coastal and Fields had borrowed nearly $30 million from Bank of America to purchase the Wyoming ranch.

35. By July 2011, Coastal and Fields were in default of their obligations to Bank of America.

36. Coastal and Fields refinanced their debt to Bank of America in 2012, pledging the Tranche B payments through a lockbox.

37. The pledge was "absolute, irrevocable, and unconditional" and secured by a UCC-1 Security Agreement.

38. A UCC-1 Security Agreement was filed against Richard Fields in the New York State Department of State on February 17, 2012.

39. A UCC-1 Security Agreement was filed against Coastal Development LLC in the Delaware Department of State on February 17, 2012.

40. Coastal also eliminated the segregated account that protected the Toussies.

41. Pursuant to an irrevocable payment direction and authorization letter, Coastal instructed Power Plant to deposit all Coastal's distributions including the Toussies' share into a "lockbox" account at Bank of America. Coastal pledged that account to the bank under a separate security agreement, also secured by a UCC filing.

8

NYSCEF DOC. NO. 2
Case 1:20-cv-05921-RRM-RLM   Document 1-3   Filed 12/05/20   Page 10 of 20 PageID #: 24
INDEX NO. 512570/2020
RECEIVED NYSCEF: 09/29/2020

42. Coastal concealed the loan and pledge of distributions and did not disclose them to the Toussies.

**V. Defaults and forbearances continued after the pledge, yet Fields borrowed more from other lenders by granting secret, pocket mortgages**.

43. The 2012 credit agreement did not resolve the ever worsening financial troubles of Coastal and Fields who entered into a fourth forbearance agreement with the Bank of America in April 2012.

44. Further defaults occurred in 2012, 2013, and 2014, leading to fifth, sixth, and seventh forbearance agreements between Coastal and Fields and the Bank of America.

45. In November 2013, Coastal borrowed an additional $2.3 million from Bank of America under the terms of the credit agreement.

46. In 2014, an entity owned by Fields failed to pay the principal owed on the loan securing Fields' GIV Gulfstream aircraft which constituted a default under the Bank of America loan agreements.

47. Covenants in the 2012 credit agreement precluded Fields from further mortgaging his properties yet he secretly borrowed more anyway. Fields tried hiding that activity from Bank of America by securing the loans with "pocket mortgages" (mortgages fully executed but not recorded) insisting that "these liens can not [sic] be recorded!!" but the lenders eventually recorded the mortgages anyway.

48. Once recorded, Bank of America learned of the side deals and issued notices of default in November 2014, and let the forbearance agreements expire.

9 of 19

**VI. Bank of America began sweeping the lock.box account and Coastal and Fields stopped paying the Toussies.**

49. In 2015, Coastal and Fields ceased providing the Toussies with CPA statements verifying the distributions Coastal received.

50. By no later than October 1, 2015, Bank of America began sweeping the lockbox account and seizing the distributions Coastal received from Power Plant.

51. In or about October, 2015 Coastal and Fields stopped making payments to the Toussies.

52. In October, 2015 Fields disclosed to the Toussies that he had "pledged the Seminole stream" to Bank of America, but even then, did not disclose that he pledged the Toussies' share.

**VII. The Defendants are Retained to Commence the Coastal Litigation.**

53. On November 13, 2015, the Toussies initiated the Coastal Litigation seeking arbitration of their rights in the Tranche B payments pursuant to the Participation Agreement.

54. On or before January 18, 2016 Toussie retained Williams & Connolly LLP in the Coastal Litigation.

55. The Defendants Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl appeared in the Coastal Litigation on behalf of Williams & Connolly.

56. The Toussies also retained Lupkin & Associates PLLC as local counsel in the Coastal Litigation.

57. The Defendants Jonathan Lupkin and Rebecca C. Smithwick appeared in the Coastal Litigation on behalf of Lupkin & Associates PLLC.

58. On January 19, 2016 the Defendants filed a Verified Petition seeking to compel

10

Fields and Coastal to engage in arbitration regarding their failure to comply with their obligations under the Participation Agreement.

59. On or about January 19, 2016 the Supreme Court of the State of New York, New York County (the "Supreme Court") issued an Order directing Fields and Coastal to show cause why they should not be compelled to participate in arbitration.

60. On or about February 12, 2016 Fields and Coastal filed a cross-motion seeking to compel the parties to engage in arbitration with the American Arbitration Association.

61. On February 17, 2016 the Defendant, Rebecca C. Smithwick, filed an application to allow the Defendants, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Litigation *pro hac vice*.

62. On February 17, 2016 the Defendant, Jonathan Lupkin, filed Affirmations in Support of the *pro hac vice* admissions of the Defendants, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl.

63. On March 2, 2016 the Supreme Court granted the motions to allow the Defendants, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Litigation *pro hac vice*.

**VIII. Fields and Coastal Stipulate to Bring the Tranche B Payments Current During the Coastal Litigation.**

64. In April 2016, Coastal and Fields agreed to a stipulated partial final award in which they agreed to make up $295,612.39 of missed payments. On August 11, 2016 the Supreme Court entered a Partial Judgment in the amount of $295,612.39 in favor of the Toussies and against Fields and Coastal (the "Partial Judgment").

11

65. On or about November 8, 2016 Fields and Coastal satisfied the Partial Judgment.

**IX. Coastal and Fields entered into an eighth forbearance agreement.**

66. In June 2016, while the arbitration was pending, and unbeknownst to the Toussies, Fields and Coastal entered into an arrangement with SFIV SS-1, LLC ("SFIV"), which, upon information and belief is owned in whole or in part by Stabilis Fund IV, LP ("Stabilis"), wherein Stabilis arranged to purchase the outstanding indebtedness which Fields and Coastal owed to Bank of America.

67. In exchange for Fields and Coastal entering into an agreement wherein some or all of the assets and income stream held by Fields' numerous LLC's, including Power Plant and the Toussie Tranche B payments, would be paid to Stabilis through a lockbox that only Stabilis controlled (the "Stabilis Forbearance Agreement").

68. Through the Stabilis Forbearance Agreement, Coastal and Fields took out $13 million more in debt, secured by the pledge.

69. On February 15, 2017 Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed an Assignment of the UCC-1 against Richard Fields with the New York State Department of State.

70. On September 7, 2016 Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed a Continuation of the UCC-1 against Coastal Development, LLC with the Delaware Department of State.

**X. The Arbitration Is Held and an Arbitration Award is Entered.**

70. During the Coastal Litigation the Defendants were advised of the terms of the Stabilis Forbearance Agreement which included that Fields and Coastal had pledged all of their

12

current and future assets to the satisfaction of the Stabilis' debt.

71. During the Coastal Litigation the Defendants were advised that the Stabilis' debt was secured by filing of UCC-1 Financing Statements.

72. During the Coastal Litigation the Defendants were advised that Stabilis was claiming to be owed in excess of 80 million dollars all of which was secured by the UCC-1 Financing Statements that had previously been filed by Bank of America.

73. During the Coastal Litigation Coastal and Fields' accountant Joseph McNulty ("McNulty") testified that the terms of that Stabilis Forbearance Agreement are "very punitive" by including an interest rate set at 15 percent with penalty interest rates of 18 percent, then 24 percent.

74. During the Coastal Litigation McNulty candidly acknowledged that "I do not know if there will be any other defaults" by Coastal and Fields to Stabilis.

75. During the Coastal Litigation McNulty acknowledged that Coastal and Fields would need to sell large commercial real-estate assets by June 2017 to avoid defaulting on the Stabilis Forbearance Agreement and would need to sell even more by December 2017 to pay off their debt and remove the pledge and offered nothing more than speculation about whether that was likely.

**XI. The Arbitration Award in the Coastal Litigation.**

76. On December 20, 2016 the Hon. Leo F. Milonas issued an Arbitration Award in the Coastal Litigation (the "Arbitration Award").

77. The Arbitration Award made several incorrect and detrimental findings of fact which adversely affected the Toussies.

78. The Arbitration Award incorrectly determined that Coastal and Fields had pledged the Toussie's portion of the Tranche B Payments to the Bank of America to secure the Bank of America loan.

79. Contrary to this finding the Bank of America Pledge & Security Agreement exempted the Toussie's Tranche B payments as collateral thereunder according to their unambiguous terms which specifically excluded distributions in which Coastal had no "right, title and interest".

80. The Bank of America Security Agreement also excluded the Toussie Tranche B Payments wherein it stated that "...in no event shall the Collateral include any...contract or property right to the extent that a security interest is prohibited by or in violation of (i) any law...applicable to such pledgor, or (ii) a term, provision or condition of any...contract, property right or agreement..."

81. The UCC-1 Financing Statements which were filed by Bank of America to secure the Coastal and Fields Note contained this same collateral exclusions language.

82. Inasmuch as there can be no argument that the pledging of the Toussie Payments by Coastal to BOA for the purposes of securing Coastal's debt to Bank of America would result in violations of "law", a "term" of the Participation Agreement and Toussies' "property rights" in the Toussie Payments, by the unambiguous terms of the Bank of America Security Agreement, the Toussie Payments were excluded as collateral.

83. The Arbitration Award improperly found that the Stabilis Forbearance Agreement reaffirmed the pledge of the Toussie's share of Tranche B Payments.

84. Under the Stabilis Forbearance Agreement the senior secured lender could acquire no

14

additional rights than Bank of America had acquired under the Bank of America Loan documents.

85. The Stabilis Forbearance Agreement could not have reaffirmed the pledge of the Toussies' share of the Tranche B Payments because Coastal and Fields did not pledge the Toussies' share under the unambiguous wording of the Bank of America Loan documents.

86. The Defendants failed to object to the finding in the Arbitration Award that Coastal and Fields had pledged the Toussie Tranche B Payments.

87. The Defendants failed to object to the finding in the Arbitration Award that Coastal and Fields had reaffirmed the pledge of the Toussie Tranche B Payments in the Stabilis Forbearance Agreement.

88. The Defendants failed to advise Toussie that this finding could have preclusive effect on his efforts to enforce his rights under the Participation Agreement.

89. The Defendants failed to advise Toussie that these findings could have preclusive effect on his efforts to enforce his rights under the Participation Agreement.

90. The Defendants moved to confirm the Arbitration Award in the Supreme Court on December 29, 2016.

X. **The Settlement Conference.**

91. On February 16, 2017 the Coastal Litigation was referred to the Alternative Dispute Resolution Program of the Supreme Court ("ADR") in an effort to negotiate a settlement between the Toussies and Fields and Coastal.

92. Upon information and belief, at the settlement conference held pursuant to the ADR Order, Fields and Coastal were current with the Tranche B Payments due under the Participation

Agreement.

93. Upon information and belief, at the settlement conference held pursuant to the ADR Order representatives of Stabilis Fund, LP appeared and intervened in the negotiations.

94. Upon information and belief, at the settlement conference held pursuant to the ADR Order Fields and Coastal, with the consent of Stabilis Fund, LP, proposed to settle the Coastal Litigation by entering into an agreement which would allow the Toussies to continue to receive the payments due them under the Participation Agreement.

95. Upon information and belief, at the settlement conference held pursuant to the ADR Order, the Defendants herein refused to enter into a settlement agreement with Coastal and Fields unless it contained a provision that their attorneys' fees would be paid in full.

96. At the time the ADR Settlement Conference was held the Defendants were claiming attorneys fees in excess of $812,340.00.

97. As a result of the Defendants' demand that their attorneys' fees be paid in full no settlement was agreed upon.

98. The Toussies paid in excess of $812,340.00 to the Defendants for their representation in the Coastal Litigation.

**XI. The Entry of the Judgment in the Coastal Litigation.**

99. On July 17, 2017 the Supreme Court entered the Judgment in the Coastal Litigation in the amount of $7,857,642.50.

100. Inasmuch as the Judgment was entered on July 17, 2017, its' priority is junior to that of the debt owed by Fields and Coastal to Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC.

101. Upon information and belief, Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC is owed in excess of 80 million dollars.

102. Upon information and belief, all of Fields and Coastal's assets, both present and future, have been pledged to Stabilis Fund IV, LP and SFIV SS-1, LLC in satisfaction of the Stabilis debt.

103. All of Toussie's efforts to enforce the Judgment have been thwarted by Stabilis Fund IV, LP and SFIV SS-1, LLC.

104. The Toussies continued to be owed the full amount of the Judgment together with any accrued and unpaid interest and attorneys' fees.

## CAUSE OF ACTION

### (Legal Malpractice)

105. Toussie repeats and realleges each and every allegation contained above as if fully set forth herein.

106. Williams & Connolly, LP and Lupkin & Associates, PLLC, the law firms hired to represent Toussie, and their associates provided Toussie with legal advice in connection with the Coastal Litigation, failed to exercise the care, skill, and diligence commonly possessed and exercised by members of the legal profession in negligently and incompetently representing Toussie's interests in the Coastal Litigation.

107. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' incompetent representation and failure to object to the findings in the Arbtitration Award that Coastal and Fields had pledged the Toussies' portion of the Tranche B Payments to Bank of America to secure the Bank of America, constituted legal malpractice.

17

108. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' incompetent representation and failure to object to the findings in the Arbtitration Award that Coastal and Fields had reaffirmed the pledge of the Toussies' portion of the Tranche B Payments to Bank of America in the Stabilis Forbearance Agreement, constituted legal malpractice.

109. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' incompetent representation and failure to advise Toussie that the entry of the Judgment would result in the termination of his rights under the Participation Agreement and would render him a junior creditor of Fields and Coastal, who had pledged all of their present and future assets in satisfaction of an 80 million dollar debt which had priority over the Judgment, constituted legal malpractice.

108. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' failure to perform the task it was hired to perform (*i.e.*, *inter alia*, protect the Toussies' rights in the Coastal Litigation) constituted legal malpractice.

109. As a direct and proximate result of Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates, Toussie has suffered actual damages in the amount of $7,857,642.50 together with interest from July 17, 2017.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands judgment against the Defendants as follows:

(a) Awarding Plaintiff actual damages in the $7,857,642.50 together with interest from July 17, 2017;

(b) Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees in connection

18

with this action; and

 (c) Together with such other and further relief which this Court deems just, proper and equitable.

Dated: June 19, 2019
   Nesconset, New York

            SCHEYER & STERN, LLC

            By: Fredrick P. Stern, Esq.
            Attorneys for Plaintiff
            110 Lake Avenue So., Suite 46
            Nesconset, NY 11767
            (631) 265-8500