UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROBERT I. TOUSSIE,

                                                    Case No. 1:20 -cv- 5921 (RRM)(RLK)

                    Plaintiff,          **AMENDED COMPLAINT**

        -against-                         JURY TRIAL DEMANDED

WILLIAMS & CONNOLLY, LLP,
JOSEPH G. PETROSINELLI,
DAVID A. FORKNER,
JONATHAN E. PAHL,
LUPKIN & ASSOCIATES, PLLC,
JONATHAN D. LUPKIN,
REBECCA C. SMITHWICK,

                    Defendants.
-----------------------------------------------------------x

    Plaintiff Robert I. Toussie ("Toussie" or "Plaintiff"), for his complaint against defendants

Williams & Connolly, LLP, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, Lupkin

& Associates, PLLC, Jonathan D. Lupkin and Rebecca C. Smithwick (sometimes collectively

referred to as "Defendants"), alleges:

                                        Introduction

    1. This is an action for legal malpractice brought by Toussie against Williams &

Connolly, LLP, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, Lupkin

& Associates, PLLC, Jonathan D. Lupkin and Rebecca C. Smithwick, his legal counsels in the

action entitled "In the Matter of the Application of Robert Toussie and Michael Toussie v.

Coastal Development, LLC and Richard Fields" filed in the Supreme Court of the State of New

York, County of New York, under Index No. 650227/2016 which sought to compel an

arbitration regarding the Toussies' enforcement of their rights pursuant to a Participation

Agreement between those parties dated September 1, 2000 and the Settlement Agreement dated

February 10, 2006 (the "Coastal Litigation"). These law firms, and their respective attorneys, were retained to protect Toussie's interests in the Coastal Litigation. As Toussie's counsel, the Defendants were responsible for, among other things, providing legal representation to Toussie in connection with the Arbitration proceedings and the judgment entered in the Coastal Litigation. Critical to carrying out this duty, the Defendants were responsible for properly advising Toussie regarding the enforcement of his rights pursuant to the Participation Agreement and the Settlement Agreement including, but not limited to, creation of a judgment in favor of Toussie and his brother, Michael Toussie (the "Judgment") and against Richard Fields and Coastal Development, LLC, and  the repercussions of entry of that Judgment on the enforcement of Toussie's rights under the Participation Agreement and the Settlement Agreement. Toussie relied on the Defendants to litigate the contract enforcement matters, to provide legal advice concerning the effect of the entry of that Judgment in the Coastal Litigation, to calculate how that Judgment would affect Toussie's ability to enforce same on the assets of Richard Fields and Coastal Development, LLC and to analyze questions of  priority that would affect the Judgment with regard to the multi-million dollar  debt held by Stabilis Fund IV, LP through its' wholly owned subsidiary, SFIV SS-1, LLC, as creditors of Richard Fields and Coastal Development, LLC.

2. Toussie's claim against the Defendants arises out of the Defendant's negligence in performing their duties, including their failure to adequately advise Toussie  of the choice between accepting the Judgment or accepting a continuing stream of payments to him, regarding the effect of the entry of that Judgment in the Coastal Litigation  and what effect it would have on the Toussie's ownership rights in the Participation Interest granted him under the Participation Agreement and the Settlement Agreement, the  priority which secured debt owed

by Richard Fields and Coastal Development, LLC to Stabilis Fund IV, LP and its' wholly owned subsidiary, SFIV SS-1, LLC (the "Secured Debt")  would have over  the Judgment and the ability of Toussie to enforce the Judgment against the assets of Richard Fields and Coastal development, LLC given the junior secured status accorded to the Judgment as a matter of law compared to the Secured Debt.  The Defendant's malpractice culminated in their arranging the entry of the Judgment in the Coastal Litigation on July 17, 2017 which effectively terminated Toussie's Participation Interests in the Tranche B Payments paid to Coastal Development, LLC in which Toussie (and others) held a 11.7847% ownership interest and relegated Toussie's rights to that of a junior judgment creditor subject to the rights of a senior secured lender who asserts an $80 million priority over the Judgment which is secured by all the present and future assets of Coastal Development, LLC and Richard Fields and renders the Judgment, therefore, illusory, worthless and unenforceable. The senior priority debt far exceeds any possible payout on the junior judgment such that Toussie will not receive any payments.  The Defendants had a duty and obligation as Toussie's counsel to identify the financial and legal effect of agreeing to  the Judgment on the Toussie Participation Interest pursuant to the Participation Agreement and the Settlement Agreement and advise Toussie of the legal effect of same.

3. The Defendants' failure to properly carry out their duties to Toussie is all the more egregious because the Defendants vigorously touted their special expertise in handling contract enforcement actions. That purported expertise led Toussie to retain the Defendants for the Coastal Litigation. However, in spite of the Defendants highly promoted experience with contract enforcement litigation, the Defendants failed to properly advise Toussie of the complete financial  effect the Judgment would have on Toussie's ownership rights and ability to collect breach of contract damages in the Participation Agreement and failed to advise Toussie that there

was a senior secured lender who asserts an $80 million priority over all of the assets of Coastal

Development LLC and Richard Fields (both present and future), which it knew or should have

known existed, and which would render the Judgment illusory, worthless and unenforceable as a

matter of law.

4. In failing to properly advise Toussie of the legal effect of the entry of the Judgment on

Toussie's ownership rights pursuant to the Participation Agreement and Settlement Agreement

and on Toussie's ability to enforce the Judgment given the superior lien of Stabilis Fund IV, LP

and its' wholly owned subsidiary SFIV SS-1, LLC on all of Richard Fields and Coastal

Development, LLC's assets, both present and future, the Defendants, failed to exercise the care,

skill, and diligence required of members of the legal profession.

5. As a direct and proximate result of the Defendants' malpractice, Toussie has suffered

and continues to suffer substantial damages.

**PARTIES**

6. Plaintiff Robert Toussie is a resident of the County of Kings, State of New York.

7. Defendant Williams & Connolly LLP is a limited liability partnership, with its

principal office located at 725 Twelfth Street, N.W. Washington, D.C. 20005.

8. Defendants, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, are attorneys

associated with Williams & Connolly, LLP and maintain a business address at 725 Twelfth.

Street, N.W. Washington, D.C. 20005.

9. Defendant Lupkin & Associates, PLLC is a professional limited liability company

with its principal office located at 80 Broad Street, Suite 1301, New York, NY 10004.

10. The Defendants Jonathan D. Lupkin and Rebecca C. Smithwick are attorneys

associated with Lupkin & Associates, PLLC and maintain a business address at 80 Broad Street,

Suite 1301, New York, NY 10004.

## BACKGROUND

11. In 2000, Coastal Development LLC ("Coastal") and Richard Fields ("Fields"), along with another entity, Native American Development LLC ("NAD"), hoped to develop two Hard Rock branded casino projects in Florida on land belonging to the Seminole Tribe of Florida (the "Tribe").

12. Coastal and NAD formed an entity, Power Plant Entertainment LLC ("Power Plant"), which entered into agreements with the Tribe to develop the casinos.

13. The agreements entitled Power Plant to certain casino revenues and profits.

14. The Toussies invested $2.88 million with Richard Fields and Coastal Development, LLC in return for a participation interest (11.7847%) to be paid into a separate bank account as the "property of the Toussies".

15. On September 1, 2000, Claimants Robert and Michael Toussie (the "Toussies") and Coastal and Fields entered into a participation agreement (the "Participation Agreement").

16. The Participation Agreement obligated the Toussies to invest several million dollars into Power Plant for the purpose of enabling Coastal and Fields to develop the casinos.

17. Coastal in turn "s[old], transfer[red], grant[ed] and convey[ed] to the [Toussies] an undivided 11.7647 percent participation interest" in all "distributions," as defined by the Participation Agreement, that Coastal receives from Power Plant or with respect to the casinos.

18. The Participation Agreement required that Coastal establish a segregated bank account into which Coastal would receive distributions and hold the Toussies' share for their benefit, as their property. Specifically, paragraph 6(b) states: "Within 30 days after the date

hereof Coastal shall establish a separate bank account at a New York City bank into which all cash Distributions receivable by Coastal shall be deposited, from which all Distributions received by Coastal shall be disbursed, and into which no other funds shall be deposited. 11.7647% of the Distributions deposited in such account shall be for the account of the [Toussies] in respect of the Participation Interest and, accordingly, shall be the property of the [Toussies]."

19. On September 1, 2000, Fields executed a guaranty (the "Guaranty') in which he personally guaranteed payment and performance of Coastal' s obligations in the Participation Agreement.

20. In the Guaranty, Fields promised to reimburse the Toussies for "any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by the [Toussies] in enforcing (other than wrongfully) this Guaranty[.]"

21. The Toussies paid Coastal $2.88 million, fulfilling their funding obligations.

22. After the casinos opened, Coastal and Fields began receiving tens of millions of dollars of distributions but did not pay the Toussies.

23. When Fields and Coastal refused to pay the Toussies pursuant to the Participation Agreement, the Toussies filed a lawsuit against Coastal and Fields in the Supreme Court of the State of New York, New York County under Index No. 04/601540.

24. The parties executed a settlement agreement on February 10, 2006, in which Coastal and Fields agreed to pay the Toussies more than $10.6 million constituting payments then due under the Participation Agreement (the "Settlement Agreement").

25. The Settlement Agreement contains a provision requiring the parties to resolve any further disputes regarding the Toussies' rights under the Participation Agreement via arbitration.

26. In April 2007, Power Plant and the Tribe resolved certain disputes between them through a settlement agreement (the "Seminole Settlement").

27. Pursuant to the Seminole Settlement Power Plant received a lump sum payment of $643,580,730.

28. The Seminole Settlement was structured as a loan, such that Power Plant would pay back the lump sum amount over time. To accomplish that, the Seminole Settlement re-allocated revenues from the Seminole casinos. Some revenues, called Tranche A, would be used to repay the loan. Other revenues, called Tranche B, would go to Power Plant.

29. The Tranche B payments paid to Power Plant from the Tribe are set at $925,000 per month.

30. The Tranche B payments have been paid to Power Plant from the Tribe every month since the Seminole Settlement went into effect.

31. The Tranche B payments are scheduled to continue to be paid to Power Plant from the Tribe until April 2029.

32. Coastal owns 45 percent of Power Plant, and $416,250 is 45 percent of the monthly Tranche B payments. Toussie's portion of this monthly payment is $48,970.56[1].

33. Coastal and Fields began using debt to finance Fields's luxury lifestyle. They bought homes in New York City, Westchester County, and Miami; property in Texas; and both a home and ranch in Wyoming. They bought thoroughbred horses and two Gulfstream airplanes. Id. (a "G-1159A Aircraft" and "GIV Aircraft").

34. Soon, however, they could not keep up with their obligations. Coastal and Fields

---

[1] Pursuant to a provision of the Settlement Agreement, the Toussies payment was reduced by $7,500.00 to $41,470.56.  This reduction was discontinued in the Arbitration Award.

had borrowed nearly $30 million from Bank of America to purchase the Wyoming ranch.

35. By July 2011, Coastal and Fields were in default of their obligations to Bank of America.

36. Coastal and Fields refinanced their debt to Bank of America in 2012, pledging the Tranche B payments through a lockbox.

37. The pledge was "absolute, irrevocable, and unconditional" and secured by a UCC-1 Security Agreement.

38. A UCC-1 Security Agreement was filed against Richard Fields in the New York State Department of State on February 17, 2012.

39. A UCC-1 Security Agreement was filed against Coastal Development LLC in the Delaware Department of State on February 17, 2012.40. Coastal also eliminated the segregated account that protected the Toussies.

40. Pursuant to an irrevocable payment direction and authorization letter, Coastal instructed Power Plant to deposit all Coastal's distributions including the Toussies' share into a "lockbox" account at Bank of America. Coastal pledged that account to the bank under a separate security agreement, also secured by a UCC filing.

41. Coastal concealed the loan and pledge of distributions and did not disclose them to the Toussies.

42. The 2012 credit agreement did not resolve the ever-worsening financial troubles of Coastal and Fields who entered into a fourth forbearance agreement with the Bank of America in April 2012.

43. Further defaults occurred in 2012, 2013, and 2014, leading to fifth, sixth, and seventh forbearance agreements between Coastal and Fields and the Bank of America.

44. In November 2013, Coastal borrowed an additional $2.3 million from Bank of America under the terms of the credit agreement.

45. In 2014, an entity owned by Fields failed to pay the principal owed on the loan securing Fields' GIV Gulfstream aircraft which constituted a default under the Bank of America loan agreements.

46. Covenants in the 2012 credit agreement precluded Fields from further mortgaging his properties yet he secretly borrowed more anyway. Fields tried hiding that activity from Bank of America by securing the loans with "pocket mortgages" (mortgages fully executed but not recorded) insisting that "these liens can not [sic] be recorded!!" but the lenders eventually recorded the mortgages anyway.

47. Once recorded, Bank of America learned of the side deals and issued notices of default in November 2014 and let the forbearance agreements expire.49. In 2015, Coastal and Fields ceased providing the Toussies with CPA statements verifying the distributions Coastal received.50. By no later than October 1, 2015, Bank of America began sweeping the lockbox account and seizing the distributions Coastal received from Power Plant.

48. In or about October, 2015 Coastal and Fields stopped making payments to the Toussies.

49. In October, 2015 Fields disclosed to the Toussies that he had "pledged the Seminole stream" to Bank of America, but even then, did not disclose that he pledged the Toussies' share.

50. On November 13, 2015, the Toussies initiated the Coastal Litigation seeking arbitration of their rights in the Tranche B payments pursuant to the Participation Agreement.

51. On or before January 18, 2016 Toussie retained Williams & Connolly LLP in the Coastal Litigation.

52. The Defendants Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl appeared in the Coastal Litigation on behalf of Williams & Connolly.

53. The Toussies also retained Lupkin & Associates PLLC as local counsel in the Coastal Litigation.

54. The Defendants Jonathan Lupkin and Rebecca C. Smithwick appeared in the Coastal Litigation on behalf of Lupkin & Associates PLLC.

55. On January 19, 2016 Defendant attorneys filed a Verified Petition seeking to compel Fields and Coastal to engage in arbitration regarding their failure to comply with their obligations under the Participation Agreement.

56. On or about January 19, 2016 the Supreme Court of the State of New York, New York County (the "Supreme Court") issued an Order directing Fields and Coastal to show cause why they should not be compelled to participate in arbitration.

57. On or about February 12, 2016 Fields and Coastal filed a cross-motion seeking to compel the parties to engage in arbitration with the American Arbitration Association.

58. On February 17, 2016 the Defendant, Rebecca C. Smithwick, filed an application to allow other Defendant attorneys, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Litigation *pro hac vice*.

59. On February 17, 2016 the Defendant, Jonathan Lupkin, filed Affirmations in Support of the *pro hac vice* admissions of the Defendants, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl.

60. On March 2, 2016 the Supreme Court granted the motions to allow the Defendant attorneys Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Arbitration *pro hac vice*.

10

61. In April 2016, Coastal and Fields agreed to a stipulated partial final award in which they agreed to make up $295,612.39 of missed payments. On August 11, 2016 the Supreme Court entered a Partial Judgment in the amount of $295,612.39 in favor of the Toussies and against Fields and Coastal (the "Partial Judgment").

62. On or about November 8, 2016 Fields and Coastal satisfied the Partial Judgment.

63. In June 2016, while the arbitration was pending, and unbeknownst to the Toussies, Fields and Coastal entered into an arrangement with SFIV SS-1, LLC ("SFIV"), which, upon information and belief is owned in whole or in part by Stabilis Fund IV, LP ("Stabilis"), wherein Stabilis arranged to purchase the outstanding indebtedness which Fields and Coastal owed to Bank of America.

64. In exchange for Fields and Coastal entering into an agreement wherein some or all of the assets and income stream held by Fields' numerous LLC's, including Power Plant and the Toussie Tranche B payments, would be paid to Stabilis through a lockbox that only Stabilis controlled (the "Stabilis Forbearance Agreement").

65. Through the Stabilis Forbearance Agreement, Coastal and Fields took out $13 million more in debt, secured by the pledge.

66. On February 15, 2017 Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed an Assignment of the UCC-1 against Richard Fields with the New York State Department of State.

67. On September 7, 2016 Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed a Continuation of the UCC-1 against Coastal Development, LLC with the Delaware Department of State.

68. During the Coastal Arbitration the Defendants were advised of the terms of the

11

Stabilis Forbearance Agreement which included that Fields and Coastal had pledged all of their current and future assets to the satisfaction of the Stabilis' debt.

69. During the Coastal Litigation the Defendants were advised that the Stabilis' debt was secured by filing of UCC-1 Financing Statements.

70. During the Coastal Litigation the Defendants were advised that Stabilis was claiming to be owed in excess of 80 million dollars all of which was secured by the UCC-1 Financing Statements that had previously been filed by Bank of America.

71. During the Coastal Litigation Coastal and Fields' accountant Joseph McNulty ("McNulty") testified that the terms of that Stabilis Forbearance Agreement are "very punitive" by including an interest rate set at 15 percent with penalty interest rates of 18 percent, then 24 percent.

72. During the Coastal Litigation McNulty candidly acknowledged that "I do not know if there will be any other defaults" by Coastal and Fields to Stabilis.

73. During the Coastal Litigation McNulty acknowledged that Coastal and Fields would need to sell large commercial real-estate assets by June 2017 to avoid defaulting on the Stabilis Forbearance Agreement and would need to sell even more by December 2017 to pay off their debt and remove the pledge and offered nothing more than speculation about whether that was likely.

74. On December 20, 2016 the Hon. Leo F. Milonas issued an Arbitration Award in the Coastal Litigation (the "Arbitration Award").

75. The Arbitration Award made several incorrect and detrimental findings of fact which adversely affected the Toussies.

76. The Arbitration Award incorrectly determined that Coastal and Fields had pledged

the Toussie's portion of the Tranche B Payments to the Bank of America to secure the Bank of America loan.

77. Contrary to this finding the Bank of America Pledge & Security Agreement exempted the Toussie's Tranche B payments as collateral thereunder according to their unambiguous terms which specifically excluded distributions in which Coastal had no "right, title and interest".

78. The Bank of America Security Agreement also excluded the Toussie Tranche B Payments wherein it stated that "...in no event shall the Collateral include any...contract or property right to the extent that a security interest is prohibited by or in violation of (i) any law...applicable to such pledgor, or (ii) a term, provision or condition of any...contract, property right or agreement..."

79.  The UCC-1 Financing Statements which were filed by Bank of America to secure the Coastal and Fields Note contained this same collateral exclusion language.

80. Inasmuch as there can be no argument that the pledging of the Toussie Payments by Coastal to BOA for the purposes of securing Coastal' s debt to Bank of America would result in violations of "law", a "term" of the Participation Agreement and Toussies' "property rights" in the Toussie Payments, by the unambiguous terms of the Bank of America Security Agreement, the Toussie Payments were excluded as collateral.

81. The Arbitration Award nevertheless improperly found that the Stabilis Forbearance Agreement reaffirmed the pledge of the Toussie's share of Tranche B Payments.

82. However, under the Stabilis Forbearance Agreement the senior secured lender could acquire no additional rights than Bank of America had acquired under the Bank of America Loan documents.

83. The Stabilis Forbearance Agreement could not have reaffirmed the pledge of the Toussies' share of the Tranche B Payments because Coastal and Fields did not pledge the Toussies' share under the unambiguous wording of the Bank of America Loan documents.

84 The Defendants failed to object to the finding in the Arbitration Award that Coastal and Fields had pledged the Toussie Tranche B Payments.

85. The Defendants failed to object to the finding in the Arbitration Award that Coastal and Fields had reaffirmed the pledge of the Toussie Tranche B Payments in the Stabilis 89. The Defendants failed to advise Toussie that this finding could have preclusive effect on his efforts to enforce his rights under the Participation Agreement.

86. The Defendants failed to advise Toussie that these findings could have preclusive effect on his efforts to enforce his rights under the Participation Agreement.

87. The Defendants moved to confirm the Arbitration Award in the Supreme Court on December 29, 2016. They did not raise any issues set forth above.

88. On February 16, 2017 the Coastal Litigation was referred to the Alternative Dispute Resolution Program of the Supreme Court ("ADR") in an effort to negotiate a settlement between the Toussies, Fields and Coastal (the "Settlement Conference").

89. Upon information and belief, at the Settlement Conference Fields and Coastal were current with the Tranche B Payments due under the Participation Agreement.

90. Upon information and belief, at the Settlement Conference representatives of Stabilis Fund, LP appeared and intervened in the negotiations.

91. Upon information and belief, at the Settlement Conference Fields and Coastal, with the consent of Stabilis Fund, LP, proposed to settle the Coastal Litigation by entering into an agreement which would allow the Toussies to continue to receive the payments due them under

14

the Participation Agreement.

92. Upon information and belief, at the Settlement Conference, the Defendants herein refused to enter into a settlement agreement with Coastal and Fields unless it contained a provision that their attorneys' fees would be paid in full.

93. At the time of the Settlement Conference the Defendants were claiming Attorneys' fees in excess of $812,340.00.

94. On April 16, 2017 the Supreme Court issued an Order referring the Coastal Litigation to the Alternative Dispute Resolution Program of the Commercial Division ("ADR") (the "ADR Order").

95. The ADR Order directed that the parties to the Coastal Litigation participate in the ADR proceedings in an attempt to resolve the matter.

96. In furtherance of the attempts of the parties to the Coastal Litigation to settle the matter, Scott M. Esterbrook, Esq., counsel for SFIV, provided written assurances to the parties to the Coastal Litigation that SFIV would grant "a *pari passu* lien on the Toussies Participation Interest and the payments made by Coastal in accordance therewith in an amount not to exceed $41,470.56 per month, provided that the Toussie Case and all related litigation is concluded in all respects with prejudice…"

97. The written assurances provided by SFIV were based upon its' understanding that "Justice Milonas' based his arbitration decision based upon his assertion that he lacked authority to grant meaningful specific performance.  The Lender is prepared to afford the lien rights (nothwithstanding the fact that we do not believe that the Toussies are entitled to them) in order to provide the necessary authority to render specific performance with respect to the Toussies rights to a cash flow participation interest over time.  This enhances the Toussies' rights provided

15

in their participation agreement."

98. SFIV was only willing to extend to the Toussies the *pari passu* lien in the event that the Defendants herein waived any claim to attorneys' fees which issue was still pending in the Coastal Litigation at that time.

99. The Defendants failed to advise the Plaintiff of the offer of extending a *pari passu* lien on the Tranche B Payments by SFIV.

100. The Defendants failed to advise the Plaintiff of the significant benefits that the *pari passu* lien on the Tranche B Payments would provide to the Toussies. The Defendants failed to advise the Plaintiff that if he elected to reject the SFIV settlement offer his Participation Interest would terminate.

101. The Defendants failed to advise the Plaintiff that if he elected to reject the SFIV settlement offer that SFIV could assert a lien over the Toussies portion of the Tranche B Payments. The Defendants failed to advise the Plaintiff that the lien which SFIV could assert on the Tranche B Payments was in excess of 80 million dollars.

101. The Defendants failed to advise the Plaintiff that SFIV could assert its lien on all of the current and future assets and income of Fields and Coastal.

102. As a result of the Defendants' demand that their attorneys' fees be paid in full by Fields and Coastal no settlement was agreed upon.

103. The Toussies paid in excess of $812,340.00 to the Defendants for their representation in the Coastal Litigation.

104. On July 17, 2017 the Supreme Court entered the Judgment in the Coastal Litigation in the amount of $7,857,642.50.

105. Inasmuch as the Judgment was entered on July 17, 2017, its priority is junior to

16

that of Secured Debt owed by Fields and Coastal to Stabilis Fund IV, LP and its wholly owned

subsidiary SFIV SS-1, LLC.

106. Upon information and belief, Stabilis Fund IV, LP and its' wholly owned subsidiary

SFIV SS-1, LLC is owed in excess of 80 million dollars.

107. Upon information and belief, all of Fields and Coastal's assets, both present and

future, have been pledged to Stabilis Fund IV, LP and SFIV SS-1, LLC in satisfaction of the

Secured Debt.

108. All of Toussie's efforts to enforce the Judgment have been thwarted by Stabilis

Fund IV, LP and SFIV SS-1, LLC.  As a matter of law, the priority of the Secured Debt is

superior to the Judgment as well as to any judgment in favor of Plaintiff.  The amount of the

Secured Debt vastly exceeds the entire revenue stream forecast to be received by Coastal.  As no

revenue stream will reach Coastal, no revenue of any variety will reach Plaintiff pursuant to the

Judgment.

109 The Toussies continued to be owed the full amount of the Judgment together with

any accrued and unpaid interest and attorneys' fees.  Under no foreseeable circumstance will a

single dollar be collected.

**FIRST CAUSE OF ACTION**

**LEGAL MALPRACTICE**

110. Toussie repeats and realleges each and every allegation contained above as if

fully set forth herein.

111. Williams & Connolly, LP and Lupkin & Associates, PLLC, the law firms hired to

represent Toussie, and their associates provided Toussie with legal advice in connection with the

Coastal Litigation, departed from good practice, failed to calculate the value or collectability of

17

the Judgment, failed to consider whether earlier and superior liens existed, failed to determine

whether, as a matter of law, the Judgement was uncollectible, whether Coastal was, in effect,

judgment proof because of earlier filed superior liens, failed to determine which of the two

possible choices could yield any payments to Plaintiff, failed to advise plaintiff on the financial

effect of attempting to execute upon the judgment in the face or earlier, superior liens, failed to

advise the client about the choice at all, made a selection of participating in the Judgment rather

than agreeing to accept continuing payments from the tranche, failed to engage in legal

reasoning, failed to research and determine the existence of earlier superior liens and the value of

those earlier superior liens, and in general failed to exercise the care, skill, and diligence

commonly possessed and exercised by members of the legal profession in negligently and

incompetently representing Toussie's interests in the Coastal Litigation.

112. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates'

negligent representation and failure to advise Toussie that the entry of the Judgment would

result in the termination of his rights under the Participation Agreement was a departure from

good practice, which proximately led to a poor economic result.  The departure and selection of

the Judgment over continuing payments rendered him a junior creditor of Fields and Coastal,

who had pledged all of their present and future assets in satisfaction of an 80-million-dollar debt

which had priority over the Judgment, constituted a further departure from good practice.

113.    This departure, in which the attorneys selected the Judgment over a continuing

payment of the tranche proximately led to the negative financial outcome for Plaintiff.

114.    "But for" this departure in failing to research, calculate, determine whether there

were earlier superior liens which would render the Judgment uncollectible, and negligent

selection there would have been a better outcome.

115.    That better outcome would have been for the Plaintiff to accept the *pari passu* lien being offered by SFIV which would allow the Tranche B payments to continue being paid to Plaintiffs.   The payments would have been $$41,470.56 per month for through and including April, 2029 comprising the amount of $6,013.231.20.

116.    "But for" defendants' departure from good practice, Plaintiff would have recovered this amount.

117. As a further departure Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' failure to perform the task it was hired to perform (i.e., inter alia, protect the Toussies' rights in the Coastal Litigation) was a departure from good practice.

118.    The Arbitration Award made findings that were contrary to law, in excess of the power of the Arbitrator, contrary to the facts, displaying a manifest disregard of the law refusing to apply lien law which was well defined, explicit and clearly applicable to the case, with an evident material mistake in the analysis of whether a third party can grant a lien over assets not within its possession or control.

119.    Defendants failed to seek to have the Arbitrator review the award, failed to seek to vacate the award on these bases and failed to make motions to renew, review, seek a rehearing or later to vacate the award before Supreme Court.

120. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' departures in the representation and the failure to object to the findings in the Arbtitration Award that Coastal and Fields had pledged the Toussies' portion of the Tranche B Payments to Bank of America to secure the Bank of America, constituted depatures from good practice.

121. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' departures in the representation and the failure to object to the findings in the Arbtitration Award

19

that Coastal and Fields had reaffirmed the pledge of the Toussies' portion of the Tranche B Payments to Bank of America in the Stabilis Forbearance Agreement, constituted a departure from good practice.

122.    Defendants' departures in the handling of the Arbitration Award proximately led to a negative financial result.  Not only did the departures lead to negligent selection of the Judgment over continuing payments from the tranche, but the failures to challenge the Arbitration award led to the loss of funds not paid from the onset of the withheld payments through the date of the Arbitration Award.  This sum, after offset for partial payment was $7,524,701 plus interest from 2017.

123.    But for these departures, Plaintiff would have been successful in recouping additional sums.  Because Defendants failed to undertake the necessary and required acts as outlined above, Plaintiff was proximately blocked from an otherwise successful claim for the monies described.

124. As a direct and proximate result of Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates, Toussie has suffered actual damages in the amount of 6,013,231.20 together with interest from July 17, 2017.


## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

125.    Plaintiff re-alleges the allegations contained in preceding paragraphs with the same force and effect as if separately set forth and numbered herein.

126.    By virtue of the attorney-client  relationship, Defendants owed Plaintiff a fiduciary duty to deal fairly, honestly and with undivided loyalty, including maintaining confidentiality,

avoiding conflicts of interest, operating competently, safeguarding client property and honoring the client's interests over their own, performing the work in a timely fashion,  not incurring unnecessary work or expenses, acquainting the firm with up-to-date information on the rights and liabilities in the subject area and in general, being knowledgeable about how to prosecute this constitutional violation and unconstitutional taking matter, file an adequate complaint and not file incompetent pleadings.

127.    Defendants were under a duty to Plaintiff to act for it, to act correctly for it, and to avoid conflicts of interest in its representation of Plaintiff by performing work that was unnecessary, contra-indicated, not solely for its benefit firm and of no benefit to the client, to give advice for Plaintiff's benefit on all matters within the scope of the representation of Plaintiff and  not to place their own interests ahead of Plaintiff's.

128.    Defendants were under a fiduciary duty to avoid engaging in conduct which caused financial harm to Plaintiff and to avoid engaging in conduct, which was unnecessary, counter-productive, counter-indicated, or simply wrongful.

129.    While acting as an attorney for, and performing work for Plaintiff, Defendants inserted attorney fee claims, negotiated for payment of attorney fees, all paid to themselves, refused to resolve the case in favor of Plaintiff, vetoed settlement proposals that did not contain payment to the attorneys, put their interest in payments to themselves at a higher priority than seeking to resolve Plaintiff's claims in his favor.

130.    Defendants performed legal work that was of no value, caused delay and lost the opportunity to obtain adequate and fair compensation for Plaintiff's injuries and damages. This contraindicated work of no value included failing to place the interests of the client before the interests of payments to the attorneys.

131.     It was a breach of fiduciary duty to engage in any of these acts. This breach of fiduciary duty caused Plaintiff to lose valuable compensation, to lose the opportunity for compensation, pay for unnecessary or contra-indicated services, become billed for those and similarly wrongful services, all to the detriment of Plaintiff.

132.     Defendants breached their fiduciary duty to Plaintiff by performing work that was unnecessary, counter-indicated, solely for the benefit of the firm and of no benefit to Plaintiff on all matters within the scope of the representation of Plaintiff, especially when they placed their own interests before that of the Client, and vetoed settlement proposals that did not compensate the attorneys to their satisfaction.

133.     That breach of fiduciary duty was a substantial factor in damages to Plaintiff and the conflict of interest between Defendants' own interests along with the delay, excessive litigation, unnecessary litigation, and loss of the ability to move forward on the litigation.

134.     But for the acts of, and fiduciary advice of Defendants, Plaintiff would have obtained fair and adequate compensation for his injuries and damages.

135.     Defendants were in violation of their fiduciary duties, were in breach of fiduciary duty, and were in violation of their ethical obligations of attorneys to their client.

136.     These violations and breaches were a substantial factor in the negative financial outcome for Plaintiff, and proximately caused financial damage to Plaintiff.

137.     As a proximate result of these shortcomings in representation, Plaintiff has been damaged by this breach of fiduciary duty and the attendant conflict of interest between Defendants and Plaintiff in an amount to be determined by the Court.

138.     By reason of the foregoing violations and breaches, Plaintiff is entitled to judgment against Defendants for a sum to be determined based on the fiduciary duty claim.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against the Defendants as follows:

(a) Awarding Plaintiff actual damages in the $7,857,642.50 on each cause of action together with interest from July 17, 2017;

(b) Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees in connection with this action; and

(c) Together with such other and further relief which this Court deems just, proper and equitable.

Dated: May 6, 2021

_____
Andrew Lavoott Bluestone
80 Chambers Street    8C
New York, New York 10007
(212) 791-5600
alb@bluestonelawfirm.co