UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ROBERT I. TOUSSIE,                                    Case No. 1:20-cv-5921(DG) (TAM)

                        Plaintiff,

       -against-

WILLIAMS & CONNOLLY, LLP, JOSEPH G.
PETROSINELLI, DAVID A. FORKNER,
JONATHAN E. PAHL, LUPKIN &
ASSOCIATES, PLLC, JONATHAN D. LUPKIN,
and REBECCA C. SMITHWICK,

                        Defendants.
------------------------------------------------------------x


# MEMORANDUM OF LAW
# IN OPPOSITION TO
# A MOTION  FOR
# SUMMARY JUDGMENT

ANDREW LAVOOTT BLUESTONE
Attorney At Law
80 Chambers Street   8th Floor
New York, New York 10007
(212) 791-5600
alb@bluestonelawfirm.com

# TABLE OF CONTENTS

Table of Authorities ........................ i

Preliminary Statement ........................ 1

Facts ........................ 5

Argument

    POINT I

        SUMMARY JUDGMENT MUST BE DENIED
        WHERE FACTS ESSENTIAL TO OPPOSE
        EXIST BUT CANNOT YET BE STATED ................. 28

    POINT II

        DEFENDANTS FAILED TO DEMONSTRATE
        *PRIMA FACIE* ENTITLEMENT TO
        PARTIAL SUMMARY JUDGMENT ................... 29

            Movant Must First Demonstrate
            There Exists No Genuine Dispute ................... 29

            An Expert Affidavit in Support of
            Summary Judgment is Obligatory ................... 32

    POINT III
        PLAINTIFF HAS DEMONSTRATE MATERIAL
        QUESTIONS OF FACT THAT REMAIN FOR
        THE TRIER OF FACT ................... 34

    POINT IV

    THE ADMISSIBLE EVIDENCE BEFORE THIS COURT
    DEMONSTRATES LEGAL MALPRACTICE ................. 36

        Elements of Legal Malpractice ................. 37

        Elements of Breach of Fiduciary Duty ................. 38

Conclusion ................. 40

# TABLE OF AUTHORITIES

*Adickes v. S.H. Kress & Co.,*
398 U.S. 144, 157 (1970) ................ 30

*Amaker v. Foley,* 270 F.3d 677 (2d Cir 2001) ................ 30

*AmBase Corp. v. Davis Polk & Wardwell,*
8 N.Y.3d 428 (2007) ................ 38

*Barack v. Seward & Kissel, LLP,*
16 Cv. 9664, 2017 U.S.Dist Lexis 147522,
2017 WL4023141 (S.D.N.Y. 2017) ................ 32

*Bauza v. Livingston,* 40 A.D.3d 791 (2d Dept, 2007) ................ 37

*Berk v. St. Vincent's Hosp & Med Ctr.*
380 F. Supp 2d 334, 343 (S.D.N.Y. 2005) ................ 34

*Berne Street Enterprises v. American Export Isbrandtsen Co.,*
289 F. Supp. 195 (S.D.N.Y. 1968) ................ 28

*Bonilla v. Bangert's Flowers,*
132 A.D.3d 618, 619 (2d Dept 2015) ................ 28

*Cajas-Romero v. Ward,*
106 A.D.3d 850, 852 (2d Dept 2013) ................ 28

*Celotex Corp. v. Catrett,*
477 U.S. 317, 320-23 (1986) ................ 29

*D.H. Blair & Co. v. Gottdiener,*
462 F.3d 95, 110 (2d Cir. 2006) ................ 29

*D'Jamoos v. Griffith,*
340 F. App'x 737, 739 (2d Cir 2009) ................ 34

*EBC I Inc., v. Goldman, Sachs & Co.,*
5 N.Y.3d 11 (2005) ................ 38

*Estate of Re v. Kornstein, Veisz & Wexler,*
958 F.Supp 907 (S.D.N.Y. 1997) ................ 38

i

*Eurycleia Partners, LP v. Seward & Kissel, LLP,*
12 N.Y.3d 553 (2009) ................... 38

*Farias v. Instructional Sys., Inc.,*
250 F.3d 91, 97 (2d Cir. 2001) ................... 30

*Ginor v. Landsberg,*
960 F. Supp. 661, 672 (S.D.N.Y. 1996) ................... 33

*Green v. Payne, Wood & Littlejohn,*
197 A.D.2d 664, 666 (2d Dept 1993) ................... 33

*Hoffenberg v. Meyers,* 2002 U.S. Dist. LEXIS 425,
99 Civ. 4674 (RWS) 2002 WL 57252
at 4 (S.D.N.Y. Jan. 16, 2002) ................... 33

*Liverpool v. Davis,*
442 F.Supp.3d 714, 722 (S.D.N.Y. 2020) ................... 30

*Magnacoustics, Inc. v. Ostrolenk, Faber, Gerb & Soffen*,
303 A.D.2d 561, 562, (2d Dept, 2003) ................... 37

*Mendoza v. Schlossman,*
87 A.D.2d 606, 607, (2d Dept,1982) ................... 37

*Middle Mkt. Fin. Corp. v. D'orazio,*
2022 U.S. Dist. LEXIS 17817;
2002 WL 31108260 (S.D.N.Y., 2002) ................... 33

*Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,*
277 F.3d 232, 236 (2d Cir. 2002) ................... 30

*N. A. Kerson Co. v.*
*Shayne, Dachs, Weiss, Kolbrenner, Levy & Levine*,
45 N.Y.2d 730, 732 (1978) ................... 38

*Nomura Asset Capital Corp. v.*
*Cadwalader, Wickersham & Taft LLP,*
26 N.Y.3d 40, 49-50 (2015) ................... 37

*Northrop v. Thorsen,*
46 A.D.3d 780 (1st Dept 2007) ................... 32

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*,
8 N.Y.3d 438 (2007) ................... 37

*Reicherbaum v. Cilmi,*
64 A.D.3d 693 (2d Dept, 2009) ......................... 38

*Sheehy v. New Century Mortg. Corp.,*
690 F. Supp.2d 51, 62-3 (E.D.N.Y. 2010) ......................... 33

*Smith v. Park Ave. Hospitality, LLC,*
2022 NY Slip Op 30167(U) ......................... 28

*Stonewell Corp. v. Conestoga Title Ins. Co.*
678 F. Supp 2d 203, 209 (S.D.N.Y. 2010) ......................... 37

*Sundsvallsbanken v. Fondmetal, Inc.,*
624 F. Supp. 811,  (S.D.N.Y. 1985) ......................... 28

*Ulico Cas. Co. v.*
*Wilson, Elser, Moskowitz, Edelman & Dicker,*
56 A.D.3d 1 (1st Dept, 2008) ......................... 38

*Vt. Teddy Bear Co. v. 1800 Beargram Co.,*
373 F.3d 241, 244 (2d Cir. 2004) ......................... 29

*Wenger v. Mollin,* 264 N.Y. 656 (1934) ......................... 34

**Statutes**

Fed. R. Civ. P. 56(a) ......................... 29

Fed. R. Civ. P. 56(c) ......................... 30

Fed. R. Civ. P. 56(f) ......................... 27

**Texts**

11 Moore's Federal Practice, § 56.11[1][a]
(Matthew Bender 3d ed.) ......................... 30

1B NY PJI3d 2:152 (2017) ......................... 35

# PRELIMINARY STATEMENT

## This Memorandum is submitted in opposition to
## Defendants' Motion for Summary Judgment.

From the onset of its representation of Plaintiff, the Williams & Connolly, LLP law firm faced a Hobson's choice: advise the client to stay with the participation agreement (but force the parties to honor it) or advise the client to seek a judgment. That Hobson's choice should have been informed by the difficult fact (as found by New York County Supreme Court at Ex. 68 and the Appellate Division at Ex. 74) that Plaintiff could not "collect his interest pursuant to the Participation Agreement" if he entered a judgment and conversely by the other difficult fact that he was precluded from collecting his interest via a judgment. (Ex. 74)

The Appellate Division (Ex. 74) and Justice Schechter earlier (Ex.68) each clearly determined that the participation agreement was the only vehicle effective to use to collect monies. Just prior to entry of the Judgment, Stabilis offered a *peri passu* lien arrangement which could take place if (and only if) Plaintiff accepted a continuing secured stream of income described in the Participation Agreement but gave up all other claims, including a claim of attorney fees. (Ex. 35)

Defendants did not forward this letter to Plaintiff directly or with any specific comment. Defendants did not discuss this letter with Plaintiff. (Toussie Affidavit) Defendants did not advise Plaintiff specifically about this offer. (Toussie Affidavit) Beyond not directly discussing the offer, Defendants never gave any real legal advice on the $7 million dollar choice between participation agreement and judgment, never gave

adequate legal advice on whether a judgment could ever be collectible, proceeded down a useless, tangled, expensive and ultimately fruitless path, all the while failing to advise Plaintiff that there was a sure way to collect on his interests. They never definitively told the client that he would be unable to collect on a judgment, as was found by the Appellate Division. (Ex. 74)

Had they advised the client to entertain the *pari passu* lien offer, a steady stream of payments for Plaintiff could have been obtained through 2029. Plaintiff would have accepted this settlement, had Defendants told him it as the sole sure way to collect. (Toussie Affidavit) Defendants failed to adequately advise Plaintiff that this was the sole path to collection. (Ex. 68,74) Their failure adequately to advise was the proximate cause of his unsuccessful quest to "collect his interest." Instead, they lauded the potential judgment and allowed Plaintiff to think it would be collectible.[1] (Michelen Dec.)

Close review of all 79 exhibits in this record demonstrates that Defendants never gave adequate advice on how to thread this $7 Million dollar needle. They barely discussed the Esterbrook letter, burying it in a motion document. (Ex. 36) Instead, they puffed up their efforts, congratulated themselves on winning a judgement, misrepresented the collectability of a judgment, misrepresented the procedure after entry of a judgment ("leverage"), fixated on obtaining attorney fee awards and misled the client by failing adequately to explain, analyze and evaluate the collection options. When the golden egg was handed to them in the *pari passu* offer (Ex. 35) they ignored it, failed to analyze or advise on the collection process, failed to evaluate the earlier liens and secured

---

[1] While Defendants did give generic advice that settlement was better than litigation or better than trying for a judgment and then facing an appeal and difficulty in collecting the judgment, Defendants never analyzed the *peri passu* offer and never analyzed the crushing $ 80 million secured debt which came before Plaintiff's judgment. No exhibit shows any real advice and no exhibit shows a discussion of the impossibility of collecting a judgment.

agreements, failed to discuss it in any detail, gave no legal advice specific to the *pari passu* lien offer, and never advised the client that there were secured parties ahead of Plaintiff in line, and that Plaintiff could never collect a payment on his judgment with an $80 Million secured debt ahead of him. (Michelen Dec.)

As the expert affidavit opines, (Michelen Dec.) this was a departure from good practice which proximately led to a bad economic result. The admissible proof that Defendants departed from good practice, supported by the complete absence of written or oral adequate advice on the *pari passu* lien offer demonstrates that there remain (at a minimum) material questions of fact which rule out summary judgment in which Defendants must rule out all questions of fact whether they departed from good practice.

Defendants WILLIAMS & CONNOLLY, LLP, JOSEPH G, PETROSINELLI, DAVID A. FORKNER and JONATHAN D. LUPKIN (collectively "Defendants") move for summary judgment. The submission is fatally defective. The submission lacks an expert opinion that Plaintiffs cannot prove at least one element of legal malpractice, lacks an expert opinion defining the standard of practice for a reasonable attorney and failing to give expert opinion that Defendants did not depart from that standard of practice.

The motion is conventionally improper because it was made prior to any discovery and while the co-defendants' motion to dismiss the complaint is *sub-judice*. Defendants prematurely move for summary judgment prior to any depositions and prior to providing any meaningful document production in the legal malpractice action. Plaintiff requires the testimony of Defendants as well as full document responses in order to oppose this motion and to prosecute the action because information necessary to

defend this motion remains solely within the control or within the knowledge of defendants and has not been disclosed.

For these reasons, the motion fails to demonstrate *prima facie* entitlement to summary judgment.

Beyond the fatal absence of an affidavit of a person with knowledge, and the equally fatal absence of expert testimony on behalf of Defendants, there is an incomplete argument on the claims of the complaint: *i.e.,* what is the standard of practice what the standard of practice requires,  whether defendants departed from that standard of practice as an attorney, failed to display a reasonable degree of skill and failed to know the rules of secured interests, collection of junior judgments and priority of claims.

Defendants failed to demonstrate *prima facie* entitlement to summary judgment by any proffer of admissible proof. Even if this Court does not determine that Defendants failed to demonstrate *prima facie* entitlement to summary judgment, Plaintiff has, in opposition, provides a counter-statement of material facts, the affidavit of Robert I. Toussie and the expert affidavit of Oscar Michelen, Esq., along with exhibits to show that material questions of fact remain to be resolved by the trier of fact on whether Defendants departed from good practice in analysis and legal advice on judgments and settlement in this setting.

Material fact issues remain on Defendants' motion concerning the departure of Defendants, the proximate relationship between the departures, and the entry of judgment which ended Toussie's rights in the participation agreement, ended any opportunity to resolve the case with a *pari passu* lien agreement, and irrevocably placed the Toussie interests behind all secured creditors, and in a position where no monies could ever be

collected from Fields or Coastal, who had a reported $80 million debt to Stabilis which far exceeded any assets or income stream. (Ex. 67) Put another way, Toussie was doomed to an ineffective, uncollectible judgment which will wither and eventually die without giving birth to any payments. Both the trial court (Ex. 68) and the Appellate Division clearly so found. (Ex. 74)

Since summary judgment is a drastic remedy not granted if there is any doubt that a triable issue of fact exists, the courts must engage in issue finding rather than issue determination.

Defendant failed to offer evidence, in admissible form, from an expert. Since the required admissible evidentiary facts required for Defendants are not put forth in the motion there remain questions of material fact.

For all these reasons and based the absence of adequate legal advice and the complete absence of advice on the *pari passu* lien offer, and the demonstrated departures from good practice, there remain material questions of fact which require determination by the trier of fact on Defendants' motion which respectfully, should be denied.

## FACTS[2]

This is an action for legal malpractice brought by Toussie against Williams & Connolly, LLP, Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl, Lupkin & Associates, PLLC, Jonathan D. Lupkin and Rebecca C. Smithwick, (Ex. P. 3), his legal counsels in the action entitled "*In the Matter of the Application of Robert Toussie and Michael Toussie v. Coastal Development, LLC and Richard Fields*" filed in the Supreme Court of the State of New York, County of New York, under Index No.

---

[2] FACTS is taken from the Second Amended Complaint, P. Ex. 3.

650227/2016 (Ex. 15)[3] which sought to compel an arbitration regarding the Toussies' enforcement of their rights pursuant to a Participation Agreement between those parties dated September 1, 2000 and the Settlement Agreement dated February 10, 2006 (the "Coastal Litigation"). These law firms, and their respective attorneys were retained to protect Toussie's interests in the Coastal Litigation. (Ex. 16) As Toussie's counsel, the Defendants were responsible for, among other things, providing legal representation to Toussie in connection with the Arbitration proceedings and any settlement, collection or judgment entered in the Coastal Litigation. Critical to carrying out this duty, the Defendants were responsible for properly advising Toussie regarding the enforcement of his rights pursuant to the Participation Agreement (Ex. 2) and the Settlement Agreement (Ex. 5) including, but not limited to, obtaining unpaid compensation from Richard Fields and Coastal Development, LLC under the Participation agreement, whether through obtaining a judgment in favor of Toussie and his brother Michael Toussie or by other means. Moreover, Defendants were retained to analyze any repercussions of entry of a Judgment on the enforcement of Toussie's rights under the Participation Agreement and the Settlement Agreement.

Toussie relied on the Defendants to litigate the contract enforcement matters, to provide legal advice concerning the effect of the entry of any Judgment in the Coastal Litigation, to calculate how a Judgment would affect Toussie's ability to enforce same on the assets of Richard Fields and Coastal Development, LLC and to analyze questions of priority that would affect the Judgment with regard to the multi-million dollar secured debt held by Stabilis Fund IV, LP through its wholly owned subsidiary, SFIV SS-1, LLC, as secured creditors of Richard Fields and Coastal Development, LLC.

---

[3] "Ex." refers to Defendants' Exhibits. "P. Ex." refers to Plaintiff's exhibits.

Toussie's claim against the Defendants arises out of the Defendant's negligence in performing their duties, including their failure to adequately advise Toussie of the choice between accepting the Judgment or accepting a continuing stream of payments to him, regarding the effect of the entry of that Judgment in the Coastal Litigation and what effect it would have on the Toussie's ownership rights granted him under the Participation Agreement and the Settlement Agreement, the priority which secured debt owed by Richard Fields and Coastal Development, LLC to Stabilis Fund IV, LP and its wholly owned subsidiary, SFIV SS-1, LLC (the "Secured Debt") would have over the Judgment and the ability of Toussie to enforce the Judgment against the assets of Richard Fields and Coastal development, LLC given the junior secured status accorded to the Judgment as a matter of law compared to the Secured Debt. (P. Ex. 67, 74)

The Defendants' malpractice culminated in their arranging the entry of the Judgment in the Coastal Litigation on July 17, 2017 (Ex. 49) which effectively terminated Toussie's Participation Interests in the Tranche B Payments paid to Coastal Development, LLC in which Toussie (and others) held a 11.7847% ownership interest and relegated Toussie's rights to that of a junior judgment creditor subject to the rights of a senior secured lender who asserts an $80 million priority over the Judgment which is secured by all the present and future assets of Coastal Development, LLC and Richard Fields and renders the Judgment, therefore, illusory, worthless and unenforceable. (Ex. 74)

The senior priority debt far exceeds all assets and any possible payout on the junior judgment such that Toussie will not receive any payments. The Defendants had a duty and obligation as Toussie's counsel to identify the specific financial and legal effect

of agreeing to the Judgment and to give adequate advice to Plaintiff with sufficient time and attention and specific detailed settlement advice on the Toussie Participation Interest pursuant to the Participation Agreement and the Settlement Agreement and advise Toussie of the legal effect of same. (Michelen Declaration)

The Defendants' failure to properly carry out their duties to Toussie is all the more egregious because the Defendants vigorously touted their special expertise in handling contract enforcement actions. That purported expertise led Toussie to retain the Defendants for the Coastal Litigation. However, in spite of the Defendants highly promoted experience with contract enforcement litigation, the Defendants failed to properly advise Toussie of the complete financial effect the Judgment would have on Toussie's ownership rights and ability to collect breach of contract damages in the Participation Agreement and failed to advise Toussie in the necessary specific and concrete terms, with adequate legal analysis of the extraordinary and dangerous position they eventually took along with specific strategic advice on success where there was a senior secured lender who asserts an $80 million priority over all of the assets of Coastal Development LLC and Richard Fields (both present and future), which it knew or should have known existed, and which would render the Judgment illusory, worthless and unenforceable as a matter of law.

In failing to properly advise Toussie of the legal effect of the entry of the Judgment (Ex. 49) on Toussie's ownership rights pursuant to the Participation Agreement (Ex. 2) and Settlement Agreement (Ex. 5) and on Toussie's ability to enforce the Judgment given the superior lien of Stabilis Fund IV, LP and its wholly owned subsidiary SFIV SS-1, LLC on all of Richard Fields and Coastal Development, LLC's assets, (Exs.

8,9,10,12,13,14,17,18,19,20,21) both present and future, the Defendants, failed to exercise the care, skill, and diligence required of members of the legal profession.

As a direct and proximate result of the Defendants' malpractice, Toussie has suffered and continues to suffer substantial damage.

In 2000, Coastal Development LLC ("Coastal") and Richard Fields ("Fields"), along with another entity, Native American Development LLC ("NAD"), hoped to develop two Hard Rock branded casino projects in Florida on land belonging to the Seminole Tribe of Florida (the "Tribe"). Coastal and NAD formed an entity, Power Plant Entertainment LLC ("Power Plant"), which entered into agreements with the Tribe to develop the casinos.

The agreements entitled Power Plant to certain casino revenues and profits. The Toussies invested $2.88 million with Richard Fields and Coastal Development, LLC in return for a participation interest (11.7847%) to be paid into a separate bank account as the "property of the Toussies". (Ex.2) pursuant to (the Participation Agreement. (Ex. 2).

The Participation Agreement obligated the Toussies to invest several million dollars into Power Plant for the purpose of enabling Coastal and Fields to develop the casinos. Coastal in turn "s[old], transfer[red], grant[ed] and convey[ed] to the [Toussies] an undivided 11.7647 percent participation interest" in all "distributions," as defined by the Participation Agreement, (Ex.2) that Coastal receives from Power Plant or with respect to the casinos. The Participation Agreement required that Coastal establish a segregated bank account into which Coastal would receive distributions and hold the Toussies' share for their benefit, as their property. Specifically, paragraph 6(b) states: "Within 30 days after the date hereof Coastal shall establish a separate bank account at a

New York City bank into which all cash Distributions receivable by Coastal shall be deposited, from which all Distributions received by Coastal shall be disbursed, and into which no other funds shall be deposited.

11.7647% of the Distributions deposited in such account shall be for the account of the [Toussies] in respect of the Participation Interest and, accordingly, shall be the property of the [Toussies]." On September 1, 2000, Fields executed a guaranty (the "Guaranty')(Ex. 4) in which he personally guaranteed payment and performance of Coastal' s obligations in the Participation Agreement.

In the Guaranty, Fields promised to reimburse the Toussies for "any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by the [Toussies] in enforcing (other than wrongfully) this Guaranty[.]" The Toussies paid Coastal $2.88 million, fulfilling their funding obligations. After the casinos opened, Coastal and Fields began receiving tens of millions of dollars of distributions but did not pay the Toussies.

When Fields and Coastal refused to pay the Toussies pursuant to the Participation Agreement, the Toussies filed a lawsuit against Coastal and Fields in the Supreme Court of the State of New York, New York County under Index No. 04/601540. The parties executed a settlement agreement on February 10, 2006, in which Coastal and Fields agreed to pay the Toussies more than $10.6 million constituting payments then due under the Participation Agreement (the "Settlement Agreement"). (Ex. 5)

The Settlement Agreement contains a provision requiring the parties to resolve any further disputes regarding the Toussies' rights under the Participation Agreement via arbitration. In April 2007, Power Plant and the Tribe resolved certain disputes between

them through a settlement agreement (the "Seminole Settlement"). Pursuant to the Seminole Settlement Power Plant received a lump sum payment of $643,580,730.

The Seminole Settlement was structured as a loan, such that Power Plant would pay back the lump sum amount over time. To accomplish that, the Seminole Settlement re-allocated revenues from the Seminole casinos. Some revenues, called Tranche A, would be used to repay the loan. Other revenues, called Tranche B, would go to Power Plant.

The Tranche B payments paid to Power Plant from the Tribe are set at $925,000 per month. The Tranche B payments have been paid to Power Plant from the Tribe every month since the Seminole Settlement went into effect. The Tranche B payments are scheduled to continue to be paid to Power Plant from the Tribe until April 2029.

Coastal owns 45 percent of Power Plant, and $416,250 is 45 percent of the monthly Tranche B payments. Toussie's portion of this monthly payment was $48,970.56[4].

Coastal and Fields began using debt to finance Fields's luxury lifestyle. They bought homes in New York City, Westchester County, and Miami; property in Texas; and both a home and ranch in Wyoming. They bought thoroughbred horses and two Gulfstream airplanes. Id. (a "G-1159A Aircraft" and "GIV Aircraft").

Soon, however, they could not keep up with their obligations. Coastal and Fields had borrowed nearly $30 million from Bank of America to purchase the Wyoming ranch. By July 2011, Coastal and Fields were in default of their obligations to Bank of America.

---

[4] Pursuant to a provision of the Settlement Agreement, the Toussies payment was reduced by $7,500.00 to $41,470.56. This reduction was discontinued in the Arbitration Award.

Coastal and Fields refinanced their debt to Bank of America in 2012, pledging the Tranche B payments through a lockbox. The pledge was "absolute, irrevocable, and unconditional" and secured by a UCC-1Security Agreement. (Exs. 6-10)

A UCC-1 Security Agreement was filed against Richard Fields in the New York State Department of State on February 17, 2012. A UCC-1 Security Agreement was filed against Coastal Development LLC in the Delaware Department of State on February 17, 2012.40. Coastal also eliminated the segregated account that protected the Toussies. (Exs. 8, 9, 11, 13)

Pursuant to an irrevocable payment direction and authorization letter, Coastal instructed Power Plant to deposit all Coastal's distributions including the Toussies' share into a "lockbox" account at Bank of America. Coastal pledged that account to the bank under a separate security agreement, also secured by a UCC filing. Coastal concealed the loan and pledge of distributions and did not disclose them to the Toussies. The 2012 credit agreement did not resolve the ever-worsening financial troubles of Coastal and Fields who entered into a fourth forbearance agreement with the Bank of America in April 2012.

Further defaults occurred in 2012, 2013, and 2014, leading to fifth, sixth, and seventh forbearance agreements between Coastal and Fields and the Bank of America. In November 2013, Coastal borrowed an additional $2.3 million from Bank of America under the terms of the credit agreement. In 2014, an entity owned by Fields failed to pay the principal owed on the loan securing Fields' GIV Gulfstream aircraft which constituted a default under the Bank of America loan agreements.

Covenants in the 2012 credit agreement precluded Fields from further mortgaging his properties yet he secretly borrowed more anyway. Fields tried hiding that activity from Bank of America by securing the loans with "pocket mortgages" (mortgages fully executed but not recorded) insisting that "these liens cannot [sic] be recorded!!" but the lenders eventually recorded the mortgages anyway. Once recorded, Bank of America learned of the side deals and issued notices of default in November 2014 and let the forbearance agreements expire. In 2015, Coastal and Fields ceased providing the Toussies with CPA statements verifying the distributions Coastal received. By no later than October 1, 2015, Bank of America began sweeping the lockbox account and seizing the distributions Coastal received from Power Plant.

In or about October 2015 Coastal and Fields stopped making payments to the Toussies. 49. In October 2015 Fields disclosed to the Toussies that he had "pledged the Seminole stream" to Bank of America, but even then, did not disclose that he pledged the Toussies' share. On November 13, 2015, the Toussies initiated the Coastal Litigation seeking arbitration of their rights in the Tranche B payments pursuant to the Participation Agreement. On or before January 18, 2016, Toussie retained Williams & Connolly LLP in the Coastal Litigation. Defendants Joseph G. Petrosinelli, David A. Forkner, Jonathan E. Pahl appeared in the Coastal Litigation on behalf of Williams & Connolly. (Ex. 16)

The Toussies also retained Lupkin & Associates PLLC as local counsel in the Coastal Litigation. The Defendants Jonathan Lupkin and Rebecca C. Smithwick appeared in the Coastal Litigation on behalf of Lupkin & Associates PLLC.

On January 19, 2016, Defendant attorneys filed a Verified Petition seeking to compel Fields and Coastal to engage in arbitration regarding their failure to comply with

their obligations under the Participation Agreement. (Ex. 15) On or about January 19, 2016, the Supreme Court of the State of New York, New York County (the "Supreme Court") issued an Order directing Fields and Coastal to show cause why they should not be compelled to participate in arbitration. On or about February 12, 2016, Fields and Coastal filed a cross-motion seeking to compel the parties to engage in arbitration with the American Arbitration Association. On February 17, 2016, the Defendant, Rebecca C. Smithwick, filed an application to allow other Defendant attorneys, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Litigation *pro hac vice*.

On February 17, 2016, the Defendant, Jonathan Lupkin, filed Affirmations in Support of the *pro hac vice* admissions of the Defendants, Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl. On March 2, 2016, the Supreme Court granted the motions to allow the Defendant attorneys Joseph G. Petrosinelli, David A. Forkner and Jonathan E. Pahl to appear in the Coastal Arbitration *pro hac vice*.

In April 2016, Coastal and Fields agreed to a stipulated partial final award in which they agreed to make up $295,612.39 of missed payments. On August 11, 2016, the Supreme Court entered a Partial Judgment in the amount of $295,612.39 in favor of the Toussies and against Fields and Coastal (the "Partial Judgment"). On or about November 8, 2016, Fields and Coastal satisfied the Partial Judgment. In June 2016, while the arbitration was pending, and unbeknownst to the Toussies, Fields and Coastal entered into an arrangement with SFIV SS-1, LLC ("SFIV"), which, upon information and belief is owned in whole or in part by Stabilis Fund IV, LP ("Stabilis"), wherein Stabilis

arranged to purchase the outstanding indebtedness which Fields and Coastal owed to Bank of America. (Exs. 10-14)

In exchange for Fields and Coastal entering into an agreement wherein some or all of the assets and income stream held by Fields' numerous LLC's, including Power Plant and the Toussie Tranche B payments, would be paid to Stabilis through a lockbox that only Stabilis controlled (the "Stabilis Forbearance Agreement").Through the Stabilis Forbearance Agreement, Coastal and Fields took out $13 million more in debt, secured by the pledge. (Exhs. 10-14, 17-21)

On February 15, 2017, Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed an Assignment of the UCC-1 against Richard Fields with the New York State Department of State. On September 7, 2016, Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC filed a Continuation of the UCC-1 against Coastal Development, LLC with the Delaware Department of State. During the Coastal Arbitration the Defendants were advised of the terms of the Stabilis Forbearance Agreement which included that Fields and Coastal had pledged all of their current and future assets to the satisfaction of the Stabilis' debt. (Exhs. 18-21)

During the Coastal Litigation the Defendants were advised that the Stabilis' debt was secured by filing of UCC-1 Financing Statements. During the Coastal Litigation the Defendants were advised that Stabilis was claiming to be owed in excess of 80 million dollars all of which was secured by the UCC-1 Financing Statements that had previously been filed by Bank of America. During the Coastal Litigation Coastal and Fields' accountant Joseph McNulty ("McNulty") testified that the terms of that Stabilis

Forbearance Agreement are "very punitive" by including an interest rate set at 15 percent with penalty interest rates of 18 percent, then 24 percent. (Exhs. 18-21, 25, 32-25)

During the Coastal Litigation McNulty candidly acknowledged that "I do not know if there will be any other defaults" by Coastal and Fields to Stabilis. During the Coastal Litigation McNulty acknowledged that Coastal and Fields would need to sell large commercial real-estate assets by June 2017 to avoid defaulting on the Stabilis Forbearance Agreement and would need to sell even more by December 2017 to pay off their debt and remove the pledge and offered nothing more than speculation about whether that was likely.

On December 20, 2016, the Hon. Leo F. Milonas issued an Arbitration Award in the Coastal Litigation (the "Arbitration Award"). The Arbitration Award made several incorrect and detrimental findings of fact which adversely affected the Toussies. (Ex. 1, 22, 43)

The Arbitration Award incorrectly determined that Coastal and Fields had pledged the Toussie's portion of the Tranche B Payments to the Bank of America to secure the Bank of America loan. Contrary to this finding the Bank of America Pledge & Security Agreement exempted the Toussie's Tranche B payments as collateral thereunder according to the unambiguous terms which specifically excluded distributions in which Coastal had no "right, title and interest". (Ex. 1)

The Bank of America Security Agreement also excluded the Toussie Tranche B Payments wherein it stated that "...in no event shall the Collateral include any...contract or property right to the extent that a security interest is prohibited by or in violation of (i) any law...applicable to such pledgor, or (ii) a term, provision or condition of

any...contract, property right or agreement..." The UCC-1 Financing Statements which were filed by Bank of America to secure the Coastal and Fields Note contained this same collateral exclusion language. (Ex. 6-10)

Inasmuch as there can be no argument that the pledging of the Toussie Payments by Coastal to BOA for the purposes of securing Coastal' s debt to Bank of America would result in violations of "law", a "term" of the Participation Agreement and Toussies' "property rights" in the Toussie Payments, by the unambiguous terms of the Bank of America Security Agreement, the Toussie Payments should have been excluded as collateral.

The Arbitration Award (Ex. 1) nevertheless improperly found that the Stabilis Forbearance Agreement reaffirmed the pledge of the Toussie's share of Tranche B Payments. However, under the Stabilis Forbearance Agreement the senior secured lender could acquire no additional rights than Bank of America had acquired under the Bank of America Loan documents.

The Stabilis Forbearance Agreement (Ex. 17) could not have reaffirmed the pledge of the Toussies' share of the Tranche B Payments because Coastal and Fields did not pledge the Toussies' share under the unambiguous wording of the Bank of America Loan documents. The Defendants failed to object to the finding in the Arbitration Award (Ex. 1) that Coastal and Fields had pledged the Toussie Tranche B Payments. The Defendants failed to object to the finding in the Arbitration Award that Coastal and Fields had reaffirmed the pledge of the Toussie Tranche B Payments in the Stabilis agreement. The Defendants failed to advise Toussie that this finding could have preclusive effect on his efforts to enforce his rights under the Participation Agreement.

The Defendants moved to confirm the Arbitration Award in the Supreme Court on December 29, 2016. (Ex. 23) They did not raise any issues set forth above. On April 16, 2017, the Supreme Court issued an Order referring the Coastal Litigation to the Alternative Dispute Resolution Program of the Commercial Division ("ADR") (the "ADR Order"). (Ex. 43)

The Coastal Litigation was referred to the Alternative Dispute Resolution Program of the Supreme Court ("ADR") in an effort to negotiate a settlement between the Toussies, Fields and Coastal (the "Settlement Conference"). (Ex. 24)

Upon information and belief, at the Settlement Conference Fields and Coastal were current with the Tranche B Payments due under the Participation Agreement. Upon information and belief, at the Settlement Conference representatives of Stabilis Fund, LP appeared and intervened in the negotiations. Upon information and belief, at the Settlement Conference Fields and Coastal, with the consent of Stabilis Fund, LP, proposed to settle the Coastal Litigation by entering into an agreement which would allow the Toussies to continue to receive the payments due them under the Participation Agreement. (Ex. 35)

Upon information and belief, at the Settlement Conference or afterwards, the Defendants herein advised Plaintiff to refuse to enter into a settlement agreement with Coastal and Fields unless it contained a provision that their attorneys' fees would be paid in full. At the time of the Settlement Conference the Defendants were claiming Attorneys' fees in excess of $812,340.00. (Toussie Affidavit) They failed to advise Plaintiff that the *pari passu* lien offer was the only possible successful strategy for him. (Toussie Affidavit)

The ADR Order directed that the parties to the Coastal Litigation participate in the ADR proceedings in an attempt to resolve the matter. In furtherance of the attempts of the parties to the Coastal Litigation to settle the matter, Scott M. Esterbrook, Esq., counsel for SFIV, provided written assurances to the parties to the Coastal Litigation that SFIV would grant "a *pari passu* lien on the Toussies Participation Interest and the payments made by Coastal in accordance therewith in an amount not to exceed $41,470.56 per month, provided that the Toussie Case and all related litigation is concluded in all respects with prejudice…" (Ex. 35)

The written assurances provided by SFIV were based upon its' understanding that "Justice Milonas' based his arbitration decision based upon his assertion that he lacked authority to grant meaningful specific performance. "The Lender is prepared to afford the lien rights (notwithstanding the fact that we do not believe that the Toussies are entitled to them) in order to provide the necessary authority to render specific performance with respect to the Toussies rights to a cash flow participation interest over time. This enhances the Toussies' rights provided in their participation agreement." (Ex. 35)

SFIV was only willing to extend to the Toussies the *pari passu* lien in the event that the Defendants herein waived any claim to attorneys' fees which issue was still pending in the Coastal Litigation at that time.(Ex. 35) The Defendants failed to advise the Plaintiff of the significance of any offer of extending a *pari passu* lien on the Tranche B Payments by SFIV and failed to explain the significance of their fee claims to the negotiation, failed to give sufficient concrete advice on this offer. (Toussie Affidavit)

The Defendants failed adequately to advise the Plaintiff of the significant benefits that the *pari passu* lien on the Tranche B Payments would provide to the Toussies. (Toussie Affidavit) The Defendants failed adequately to advise the Plaintiff on the effect of and on how to choose the relief he sought and that if he elected to reject the SFIV settlement offer his Participation Interest would terminate. (Toussie Affidavit) The Defendants failed to give adequate advice to the Plaintiff on the legal effects on future collectability of his claims if he elected to reject the SFIV settlement offer that SFIV could assert a lien over the Toussies portion of the Tranche B Payments. (Toussie Affidavit) The Defendants failed to advise the Plaintiff that the lien which SFIV could assert on the Tranche B Payments was in excess of 80 million dollars. (Toussie Affidavit, Michelen Dec.)

The Defendants failed adequately to advise the Plaintiff on how SFIV could assert its lien on all of the current and future assets and income of Fields and Coastal and whether it would be to his detriment. (Toussie Affidavit) As a result of the Defendants' concentration on attorney fees, to be paid in full by Fields and Coastal no settlement was agreed upon. (Toussie Affidavit, Michelen Dec.)

The Toussies paid in excess of $812,340.00 to the Defendants for their representation in the Coastal Litigation. On July 17, 2017, the Supreme Court entered the Judgment in the Coastal Litigation in the amount of $7,857,642.50. Inasmuch as the Judgment was entered on July 17, 2017, its priority is junior to that of Secured Debt owed by Fields and Coastal to Stabilis Fund IV, LP and its wholly owned subsidiary SFIV SS-1, LLC. (Ex. 49)

Upon information and belief, Stabilis Fund IV, LP and its' wholly owned subsidiary SFIV SS-1, LLC is owed in excess of $80 million dollars. (Ex. 67) Upon information and belief, all of Fields and Coastal's assets, both present and future, have been pledged to Stabilis Fund IV, LP and SFIV SS-1, LLC in satisfaction of the Secured Debt.(Ex. 3, 6-10, 12, 13, 14, 18-21)

All of Toussie's efforts to enforce the Judgment have been thwarted by Stabilis Fund IV, LP and SFIV SS-1, LLC. As a matter of law, the priority of the Secured Debt is superior to the Judgment as well as to any judgment in favor of Plaintiff. (Ex. 74) The amount of the Secured Debt vastly exceeds the entire revenue stream forecast to be received by Coastal. As no revenue stream will reach Coastal, no revenue of any variety will reach Plaintiff pursuant to the Judgment.

The Toussies continued to be owed the full amount of the Judgment together with any accrued and unpaid interest and attorneys' fees. Under no foreseeable circumstance will a single dollar be collected. (Toussie Affidavit, Michelen Dec.)

Williams & Connolly, LP and Lupkin & Associates, PLLC, the law firms hired to represent Toussie, and their associates who provided Toussie with legal advice in connection with the Coastal Litigation, departed from good practice, failed correctly, effectively and adequately to calculate the value or collectability of the Judgment, failed to consider whether earlier and superior liens existed, failed to determine whether the Judgement was uncollectible, whether Coastal was, in effect, judgment proof because of earlier filed superior secured liens, failed to determine which of the two possible choices could yield the best or any payments to Plaintiff, failed adequately to advise plaintiff on the financial effect of attempting to execute upon the judgment in the face of earlier,

superior liens, failed to give complete, clear and unequivocal advice on collections and the potential success or failure for any particular strategy of collections, failed adequately to advise the client about the choice, made a recommendation of the selection of participating in the Judgment rather than agreeing to accept continuing payments from the tranche, failed to engage in legal reasoning and explanation to the client, failed adequately to research and determine the existence of earlier superior liens and the value of those earlier superior liens, gave inadequate time and effort in communicating with Plaintiff, gave inadequate advice on how to choose between the various collection strategies and in general failed adequately to exercise the care, skill, and diligence commonly possessed and exercised by members of the legal profession in negligently and incompetently representing Toussie's interests in the Coastal Litigation. (Michelen Dec.)

Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' negligent representation and failure adequately to advise Toussie that the entry of the Judgment would or could or might result in the termination of his rights under the Participation Agreement was a departure from good practice, which proximately led to a poor economic result. The departure and selection of the Judgment over continuing payments rendered him a junior creditor of Fields and Coastal, who had pledged all of their present and future assets in satisfaction of an 80-million-dollar debt which had priority over the Judgment, constituted a further departure from good practice.(Michelen Dec.)

This departure, in which the attorneys inadequately advised and failed to offer cogent, complete or adequate legal advice led to the selection of the Judgment over a

continuing payment of the tranche proximately and led to the negative financial outcome for Plaintiff. (Michelen Dec.)

"But for" this departure in failing adequately to research, calculate, determine whether there were earlier superior liens which would render the Judgment uncollectible, and failing to give adequate advice so as to avoid the negligent selection there would have been a better outcome. (Michelen Dec.)

That better outcome would have been for the Plaintiff to accept the *pari passu* lien being offered by SFIV which would allow the Tranche B payments to continue being paid to Plaintiffs.   The payments would have been $41,470.56 per month through and including April 2029 comprising the amount of $6,013.231.20. (Michelen Dec.)

"But for" defendants' departures from good practice, Plaintiff would have recovered this amount by settling on these terms which it would have done with proper advice. (Michelen Dec.)

As a further departure Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' failure to object to portion s of the Arbitration Award  was a departure from good practice. (Michelen Dec.)

The Arbitration Award made findings that were contrary to law, in excess of the power of the Arbitrator, contrary to the facts, displaying a manifest disregard of the law, refusing to apply lien law which was well defined, explicit and clearly applicable to the case, with an evident material mistake in the analysis of whether a third party can grant a lien over assets not within its possession or control.

Defendants failed to seek to have the Arbitrator review the award, failed to seek to vacate the award on these bases and failed to make motions to renew, review, seek a

rehearing or later to vacate the award before Supreme Court. Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' departures in the representation and the failure to object to the findings in the Arbitration Award that Coastal and Fields had pledged the Toussies' portion of the Tranche B Payments to Bank of America to secure the Bank of America, constituted departures from good practice.(Michelen Dec.)

Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates' departures in the representation and the failure adequately to object to or make sufficient objections to, or adequately move to disconfirm the findings in the Arbitration Award that Coastal and Fields had reaffirmed the pledge of the Toussies' portion of the Tranche B Payments to Bank of America in the Stabilis Forbearance Agreement, constituted a departure from good practice. (Michelen Dec.)

Defendants' departures in the handling of the Arbitration Award proximately led to a negative financial result. Not only did the departures lead to negligent selection of the Judgment over continuing payments from the tranche, but the failures to challenge the Arbitration award led to the loss of funds not paid from the onset of the withheld payments through the date of the Arbitration Award. This sum, after offset for partial payment was $7,524,701 plus interest from 2017. (Michelen Dec.)

But for these departures, Plaintiff would have been successful in recouping additional sums. Because Defendants failed adequately to undertake the necessary and required acts as outlined above, Plaintiff was proximately blocked from an otherwise successful claim for the monies described. (Michelen Dec.)

As a direct and proximate result of departures by Williams & Connolly, LP and Lupkin & Associates, PLLC's and their associates, Toussie has suffered actual damages

24

in the amount of $6,013,231.20 together with interest from July 17, 2017. (Michelen Dec.)

By virtue of the attorney-client relationship, Defendants owed Plaintiff a fiduciary duty to deal fairly, honestly and with undivided loyalty, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the client's interests over their own, performing the work in a timely fashion, not incurring unnecessary work or expenses, acquainting the firm with up-to-date information on the rights and liabilities in the subject area and in general, being knowledgeable about how to prosecute this constitutional violation and unconstitutional taking matter, file an adequate complaint and not file incompetent pleadings. (Michelen Dec.)

Defendants were under a duty to Plaintiff to act for it, to act correctly for it, and to avoid conflicts of interest in its representation of Plaintiff by performing work that was unnecessary, contra-indicated, not solely for benefit of the firm and of no benefit to the client, to give advice for Plaintiff's benefit on all matters within the scope of the representation of Plaintiff and not to place their own interests ahead of Plaintiff's.(Michelen Dec.)

Defendants were under a fiduciary duty to avoid engaging in conduct which caused financial harm to Plaintiff and to avoid engaging in conduct, which was unnecessary, counter-productive, counter-indicated, or simply wrongful. While acting as an attorney for, and performing work for Plaintiff, Defendants inserted attorney fee claims, negotiated for payment of attorney fees, all paid to themselves, refused to resolve the case in favor of Plaintiff, vetoed settlement proposals that did not contain payment to the attorneys, put their

interest in payments to themselves at a higher priority than seeking to resolve Plaintiff's claims in his favor. (Michelen Dec.)

Defendants performed legal work that was of no value, caused delay and lost the opportunity to obtain adequate and fair compensation for Plaintiff's injuries and damages. This contraindicated work of no value included failing to place the interests of the client before the interests of payments to the attorneys.  It was a breach of fiduciary duty to engage in any of these acts. This breach of fiduciary duty caused Plaintiff to lose valuable compensation, to lose the opportunity for compensation, pay for unnecessary or contra-indicated services, become billed for those and similarly wrongful services, all to the detriment of Plaintiff.  (Michelen Dec.)

Defendants breached their fiduciary duty to Plaintiff by performing work that was unnecessary, counter-indicated, excessive, solely for the benefit of the firm and of no benefit to Plaintiff on all matters within the scope of the representation of Plaintiff, especially when they placed their own interests before that of the Client, and vetoed settlement proposals that did not immediately compensate the attorneys to their satisfaction.  That breach of fiduciary duty was a substantial factor in damages to Plaintiff and the conflict of interest between Defendants' own interests along with the delay, excessive litigation, unnecessary litigation, and loss of the ability to move forward on the litigation. (Michelen Dec.)

But for the acts of, and fiduciary advice of Defendants, Plaintiff would have obtained fair and adequate compensation for his injuries and damages.  Defendants were in violation of their fiduciary duties, were in breach of fiduciary duty, and were in violation of their ethical obligations of attorneys to their client.

These violations and breaches were a substantial factor in the negative financial outcome for Plaintiff, and proximately caused financial damage to Plaintiff.   As a proximate result of these shortcomings in representation, Plaintiff has been damaged by this breach of fiduciary duty and the attendant conflict of interest between Defendants and Plaintiff in an amount to be determined by the Court.

**ARGUMENT**

**POINT I**

**SUMMARY JUDGMENT MUST BE DENIED
WHERE FACTS ESSENTIAL TO OPPOSE
EXIST BUT CANNOT YET BE STATED**

Fed. R. Civ. P. 56(f) applies when a non-moving party seeks to delay a court's consideration of a motion for summary judgment due to the non-moving party's inability to produce facts sufficient to meet its burden of production in response to the motion for summary judgment.

The Court is permitted  to "refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed. R. Civ. P. 56(f); *Sundsvallsbanken v. Fondmetal, Inc.,* 624 F. Supp. 811,  (S.D.N.Y. 1985).

The Court is required to ensure that Plaintiff has a reasonable opportunity to make their record complete before ruling on a motion for summary judgment. *Berne Street Enterprises v. American Export Isbrandtsen Co.,* 289 F. Supp. 195 (S.D.N.Y. 1968)

In state practice, the substantive law holds that summary judgment is premature where discovery may lead to relevant evidence or the facts essential to justify opposition to the motion and where those facts are exclusively within the knowledge or control of the movant.  *Bonilla v. Bangert's Flowers,* 132 A.D.3d 618, 619 (2d Dept 2015)

Evidence sufficient to defeat a motion which may be uncovered are sufficient to deny the motion for summary judgment. *Cajas-Romero v. Ward,* 106 A.D.3d 850, 852 (2d Dept 2013)  As in *Smith v. Park Ave. Hospitality, LLC,* 2022 NY Slip Op 30167(U)

"discovery in this action, in which a preliminary conference has yet to be conducted, would flesh out details." Details here include communications by the defendant law firm over how it would defend the summary judgment motion, the documents it had in its possession, and any memoranda or communications over why it did not use documents that were probative, relevant and compelling in defending plaintiffs against summary judgment.

The requested discovery consists of depositions of the defendants and the provision of email communications between Defendants and the attorneys for Fields/Coastal.


## POINT II


### DEFENDANTS FAILED TO DEMONSTRATE
### *PRIMA FACIE* ENTITLEMENT TO
### PARTIAL SUMMARY JUDGMENT

**Movant Must First Demonstrate**
**There Exists No Genuine Dispute**

Under Rule 56, summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Celotex Corp. v. Catrett,* 477 U.S. 317, 320-23 (1986). However,

> The court may not grant the motion without examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for the trial. If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.

*D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir. 20060 (quoting *Vt. Teddy Bear*

*Co. v. 1800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004).

A court should "construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.,* 250 F.3d 91, 97 (2d Cir. 2001) A court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. *Vermont Teddy Bear Co.* at 244.

Summary judgment may not be granted unless the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c).

Defendants bear the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)

Movant must make a "*prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.) A fact is material if it might affect the outcome of the suit under governing law and is genuinely in dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liverpool v. Davis,* 442 F.Supp.3d 714, 722 (S.D.N.Y. 2020).

The burden is on defendants to demonstrate that no genuine issue of material fact remains. *Amaker v. Foley,* 270 F.3d 677 (2d Cir 2001). The questions of fact all revolve around whether defendants gave adequate legal advice on how to collect on Plaintiff's interests. A survey of the 79 exhibits put forward in support of the motion shows, without a doubt, that defendants did not advise Plaintiff about the *pari passu* lien offer in any detail at all. They did not analyze the overwhelming debt that Coastal, and Fields owed to Stabilis, not did they ever report to Plaintiff that there was an approximately $ 80 million

secured debt which would always be senior to Plaintiff's judgment.

Defendants failed at their burden to show that there is no question of fact that they defeat the failure adequately to advise on judgment v. settlement. They failed to stablish the lack of a genuine dispute of material fact.[5] The claim in this case is that defendants failed adequately to advise on how to structure a claim to collect on Plaintiff's interests.

The question of judgment v. *pari passu* lien offer is the central issue in this legal malpractice case. Did defendants adequately advise Plaintiff on how he might collect money with a $ 80 million secured debt in existence superior to his claim? Charitably, the best answer for defendants is that it remains a question of fact.[6]

They did not give any adequate advice.[7] The Appellate Division put it simply in Exhibit 74. "To the extent Toussie seeks to collect his interest pursuant to the Participation Agreement, he is precluded from doing so by virtue of the judgment."

Conversely, a judgment cannot win Plaintiff's interests. Coastal and Fields "qualify as `any other person' against whom Investors [Toussie] may not take any action for that purpose." (Ex. 74) "No valid claim could be stated under the Debtor and Creditor Law. Defendants' interest in Power Plant distributions derives from a valid assignment, is supported by fair consideration and is security for a legitimate debt." (Ex. 74)

Hence, as the Appellate Division found, once judgment was entered, nothing could be obtained under the Participation Agreement. (Ex. 74) The judgment, once entered was

---

[5] Review of their exhibits demonstrates that they merely gave generic advice: "settle." They never told the client that a judgment was out of the picture and could never succeed as did the Appellate Division. (Ex. 74)

[6] Defendants boldly and baldly claim that saying in general that "it is better to settle" is adequate legal advice in this complicated $ 7 Million dollar judgment v. *pari passu* case.

[7] One can correctly say that they gave no advice at all, when not a single exhibit put forth by defendants even mentions the words *pari passu* and where none of them analyze the secured debt which was superior to a potential judgment for plaintiff. At best they gave generic advice that a settlement is better than a judgment which could lead to an appeal, or an expensive search for assets.

worthless, could not be collected upon and was junior to a valid assignment which was supported by fair consideration and was security for a legitimate debt. Checkmate.

Defendants never met their burden to show that they gave adequate advice on how to enforce plaintiff's interests. There was but one way, and that way was acceptance of the *pari passu* lien offer. Saying that there is "a significant risk that you could go through the entire process…and recover nothing" does not advise that under no circumstances could a judgment be collectible. (Ex. 74) It is (at best for Defendants) a question of material fact whether this advice was adequate. Plaintiff's expert says it is inadequate. (Michelen Dec.)

While the *pari passu* lien offer might not have netted plaintiff the entirety of his claim, and while attorney fees might not have been collectible, at least plaintiff would have had the stream of secured payments running to 2029.

Defendants fixated on the attorney fee issue, gave inadequate advice on the non-collectible of the judgment, failed to analyze the value of the *pari passu* lien offer, and never directly advised the client on the pros and cons of taking a judgment over a *pari passu* lien offer.

**An Expert Affidavit in Support of**
**Summary Judgment is Obligatory**

In determining negligence in a legal malpractice case (as well as determining that there was no negligence), expert testimony may be required to establish an applicable standard of care. *Barack v. Seward & Kissel, LLP,* 16 Cv. 9664, 2017 U.S. Dist Lexis 147522, 2017 WL4023141 (S.D.N.Y. 2017) Expert testimony is normally needed to establish that the attorney failed to exercise (or in a summary judgment setting that the attorney did exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession. *Northrop v. Thorsen,* 46 A.D.3d 780 (1st Dept 2007)

Here it is obligatory given the complicated nature of judgment collection, pari passu lien offers, secured debt and the impossibility of becoming senior to an $80 million secured debt. (Ex. 67)

"New York Courts generally require expert testimony to establish the standard of care in legal malpractice cases. Typically, in these cases, expert testimony is used to establish the reasonableness of discretionary decisions made by an attorney…" *Sheehy v. New Century Mortg. Corp.,* 690 F. Supp. 2d 51, 62-3 (E.D.N.Y. 2010). Defendants' summary judgment motion seeks a determination that their professional work remained within the standard of care. They cannot prove that point absent expert testimony. They allege that Plaintiff cannot demonstrate that they departed from this standard, Defendants cannot show the lack of material fact on this issue absent expert testimony.

"Expert testimony is ordinarily required in a legal malpractice case concerning the issue of defendant's departure from acceptable professional standards." *Middle Mkt. Fin. Corp. v. D'Orazio,* 2022 U.S. Dist. LEXIS 17817; 2002 WL 31108260 (S.D.N.Y., 2002); *Hoffenberg v. Meyers,* 2002 U.S. Dist. LEXIS 425, 99 Civ. 4674 (RWS) 2002 WL 57252 at 4 (S.D.N.Y. Jan. 16, 2002); *Ginor v. Landsberg,* 960 F. Supp. 661, 672 (S.D.N.Y. 1996); *Green v. Payne, Wood & Littlejohn,* 197 A.D.2d 664, 666 (2d Dept 1993) Defendants cannot demonstrate that they acted within the applicable standard of practice absent expert testimony saying just that.

There was no expert testimony offered on behalf of defendants to say what the standard of practice was with regard to judgments and liens. There was no expert testimony to say that defendants acted with the necessary skill and knowledge commonly possessed by a member of the legal profession.

Where there are competing expert opinions, there is a material question of fact requiring trial. *D'Jamoos v. Griffith,* 340 F. App'x 737, 739 (2d Cir 2009). If only Plaintiff offers expert opinion on whether Defendants departed from the standard of practice required for the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, the same must be true.

Absent expert testimony, movant's proffer failed to demonstrate *prima facie* entitlement to summary judgment. Expert testimony is normally required to establish the applicable standard of practice. In this setting movant is absolutely required to present expert testimony to establish that the attorney did not depart from the applicable standard of practice. *Wenger v. Mollin,* 264 N.Y. 656 (1934); *Berk v. St. Vincent's Hosp & Med Ctr.* 380 F. Supp 2d 334, 343 (S.D.N.Y. 2005)


## POINT III

### PLAINTIFF HAS DEMONSTRATED MATERIAL QUESTIONS OF FACT REMAIN FOR THE TRIER OF FACT

Plaintiff offers the affidavit of Robert Toussie to show that he was never given any adequate legal advice concerning the *pari passu* lien offer. His affidavit demonstrates that Defendants told him that a judgment could be collected, when in fact it could never be collected. (Toussie Affidavit; Ex. 74)

The Toussie affidavit demonstrates that Defendants did not discuss any question of collection of a judgment, nor of priority of judgments, nor of secured debt, nor of UCC Financing Statements, nor of the nature of the Stabilis secured interests. The failure to

give legal advice on these issues demonstrates a material question of fact whether Defendants adequately advised Plaintiff.

The Michelen Declaration gives expert opinions with a reasonable degree of legal certainty on the standard of practice for a reasonable attorney in this setting. He gives expert testimony that Defendants departed from that standard of good practice and proximately caused Plaintiff to choose to proceed to a judgment which was uncollectible, was futile, and was found by the Appellate Division to be faulty. (Ex. 74). Their lack of adequate., specific advice on the *pari passu* lien offer doomed Plaintiff's ability to collect on his interests. (Ex. 74) The failure to identify, research, advise on the *pari passu* lien offer, which was never identified by Defendants to Plaintiff, doomed any informed choice he might have made. Mr. Michelen opines that Defendants departed from good practice in the lack of legal advice on the potential settlement and was a proximate cause of the negative outcome for Plaintiff. This opinion, by itself, is sufficient to rule out summary judgment.

Close analysis of each of the exhibits offered in support of summary judgment demonstrates that Defendants never identified the *pari passu* offer except to sandwich it in a motion document, never evaluated that offer, never advised on how to choose between seeking a judgment and taking that specific offer, never advised that a judgment could not be collected, never advised that settlement was the only option. Instead, the best that can be said is that generic advice that settlement is better than judgment and that judgments cannot always be collected was substituted for the specific advice that a judgment in this setting was never collectible and was a complete and total waste of time.

Worse, it took away the only method of obtaining his interests. (Toussie Affidavit, Michelen Dec.)

Defendants failed to present any competent evidence of the standard of practice or skill for a "an attorney who undertakes to represent a client [who] is expected to exercise a reasonable degree of skill and be familiar with the applicable rules of practice and the settled principles of law and is expected to exercise reasonable care in representing the client. Reasonable care means that degree of care commonly exercised by an ordinary member of the legal profession." *Pattern Jury Instructions,* 1B NY PJI3d 2:152 (2017). (Michelen Dec.)

Defendants failed to offer any competent evidence that they exercised "that degree of care, skill and diligence commonly exercised by a member of the legal profession" and that they did not fail to analyze, advise or determine the proper method of obtaining Plaintiff's interest in the Participation Agreement or to determine whether any judgment obtained could reasonably be collected in view of earlier and senior secured debt and the lack of sufficient assets or income stream to satisfy the earlier and senior secured debt and allow for payments to Plaintiff. 1B NY PJI3d 2:152 (2017). (Michelen Dec.)


**POINT IV**

**THE ADMISSIBLE EVIDENCE BEFORE THIS COURT
DEMONSTRATES LEGAL MALPRACTICE**


This is an action for legal malpractice, breach of contract, breach of Defendants' fiduciary duty of undivided loyalty to plaintiff as its attorney, all based upon the

negligent handling of the Toussie claims. Simply, to prevail in a cause of action for legal malpractice, a plaintiff must establish the attorney "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession and that the attorney's breach of this duty proximately caused plaintiff to sustain actual and ascertainable damages." *Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP,* 26 N.Y.3d 40, 49-50( 2015)  To succeed on a motion for summary judgment, the defendant must establish that plaintiff cannot prove at least one of these essential elements. *Stonewell Corp. v. Conestoga Title Ins. Co.* 678 F. Supp 2d 203, 209 (S.D.N.Y. 2010)

**Elements of Legal Malpractice**

To sustain a cause of action alleging legal malpractice, a plaintiff must establish that the attorney "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession," and that the attorney's breach of this duty proximately caused the plaintiff actual and ascertainable damages. *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438 (2007); *Bauza v. Livington*, 40 A.D.3d 791 (2d Dept, 2007); *Magnacoustics, Inc. v. Ostrolenk, Faber, Gerb & Soffen*, 303 A.D.2d 561, 562, (2d Dept, 2003)

Analysis appropriately begins with the observation that recovery for professional malpractice against an attorney requires that a client prove three elements**:** "(1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages" *Mendoza v. Schlossman*, 87 A.D.2d 606, 607, (2d Dept, 1982) The cause of action requires the plaintiff to establish that counsel "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a

member of the legal profession" and to meet the exacting standard that "'but for' the attorney's negligence" the outcome of the matter would have been substantially different. *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428 (2007)*; N. A. Kerson Co. v. Shayne, Dachs, Weiss, Kolbrenner, Levy & Levine*, 45 N.Y.2d 730, 732 (1978)

### Elements of Breach of Fiduciary Duty

"A fiduciary relationship arises 'between two persons when one of them is under a duty to act for, or to give advice for the benefit of another upon matters within the scope of the relation." *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553 (2009), quoting *EBC I Inc., v. Goldman, Sachs & Co.,* 5 N.Y.3d 11 (2005)

As attorney for plaintiff, there is unquestionably a fiduciary relationship between plaintiff and defendants. The damages in this portion of the case arise from, and are directly linked to the acts of defendants, and the proximate damages which flowed directly from the breached fiduciary obligations including the disgorgement of legal fees, which would not be available in legal malpractice. Hence the damages are different from, arise from different sources, and are not duplicative of legal malpractice damages. *Reicherbaum v. Cilmi,* 64 A.D.3d 693 (2d Dept, 2009) Damages her arise from the unnecessary legal fees paid to the defendant, which are not an element of the legal malpractice claims.

"The action for breach of fiduciary duty is governed by a considerably lower standard of recovery. It requires only that the plaintiff "identify a conflict of interest which amounts to merely a substantial factor in the loss. *Estate of Re v. Kornstein, Veisz & Wexler,* 958 F.Supp 907 (S.D.N.Y. 1997)

Any act of disloyalty by counsel will also comprise a breach of fiduciary duty, owed to the client. *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker,* 56 A.D.3d 1 (1st Dept, 2008)

It is significant that the retention agreement between Plaintiff and Defendants was to pay hourly rate payments to the law firm in its representation of the Plaintiff. When Defendants agreed to be retained by Plaintiffs to represent them a contractual relationship was formed. Defendants, in consideration of legal fees, agreed to provide specific competent and professional legal services and to bill appropriately for these services. Plaintiffs and Defendants entered into a contract in which Defendants agreed to represent Plaintiffs according to the standards of good and adequate representation by an attorney, and Plaintiffs agreed to pay fees as demanded by Defendants. Defendants breached the contract by the nature of their bills and by billing failures as set forth above.

# CONCLUSION

Defendants' motion is premature. It comes before any real document production and without any depositions. Permission to make the motion was requested prior to the case management order and without any discovery.

Defendants fail to demonstrate *prima facie* entitlement to summary judgment. They premise the argument that they did not depart from the standard of care without defining the standard of care. That standard can only be proven through the testimony of an expert. Defendants offer no expert.

Defendants fail to demonstrate *prima facie* entitlement to summary judgment where they fail to offer a single exhibit to show that they gave any real advice to the client on the question of judgment or participation agreement.

Finally, even if this Court determines that there was *prima facie* entitlement to summary judgment, Plaintiff proffers the unopposed exert testimony to show that Defendants departed from the applicable standard of practice and to show the proximate results of those departures.

Plaintiff offers the affidavit of Robert I. Toussie to show that Defendants never advised him of the issues with collection of a judgment in the setting where there are approximately $80 million in secured debt which is superior to Plaintiff's potential judgment with an income stream and with assets insufficient to cure or resolve the secured debt. Plaintiff shows, via analysis of the exhibits, through the affidavit of Toussie and by expert testimony that Defendants departed from good practice, failed to offer adequate advice on how to resolve Plaintiff's collection rights to the debt owed by

Fields/Coastal and which show that there remain material questions of fact which require

resolution by the trier of fact.

Summary judgment should, respectfully, be denied.

Dated: New York, New York
June 20, 2022

s/ANDREW LAVOOTT BLUESTONE
_____
Andrew Lavoott Bluestone
80 Chambers Street   8th Floor
New York, New York 10007
(212) 791-5600