UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

ROBERT I. TOUSSIE,

                Plaintiff,

       -against-

WILLIAMS & CONNOLLY, LLP, et al.,

                Defendants.

----------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
20-CV-5921 (DG) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

Plaintiff Robert I. Toussie brings this case claiming malpractice related to Defendants' legal representation in connection with Plaintiff's efforts to enforce certain contractual relationships, as well as in a related New York State court action. (Second Amended Complaint ("SAC"), ECF No. 47, ¶ 1.) Presently before the Court are a motion to dismiss and a motion for summary judgment brought by two groups of attorney defendants who formerly represented Plaintiff. For the following reasons, the Court respectfully recommends granting both motions in part and denying them in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Underlying Litigation

The Court provides a brief summary of the allegations in the SAC concerning the underlying litigation that formed the basis for the attorney-client relationship between Plaintiff and Defendants so as to put the current motions into context. In brief, Plaintiff hired Defendants to represent him in his efforts to enforce certain contracts to which he was a party, along with Coastal Development LLC ("Coastal") and Richard Fields ("Fields"). (*See* SAC, ECF No. 47, ¶¶ 1–4, 11–25.) The first underlying contract was a "Participation Agreement," by which Plaintiff Robert Toussie, together with his brother

Michael Toussie (collectively the "Toussies"), agreed to invest several million dollars into a company called Power Plant so that Power Plant, Coastal, and Fields could develop two casino projects on land belonging to the Seminole Tribe of Florida. (*Id.* ¶¶ 11, 16–17.) In exchange, the Toussies were to be provided a percentage of all distributions that Coastal received from Power Plant "or with respect to the casinos." (*Id.* ¶ 17.)

Plaintiff alleges that the Toussies paid Coastal $2.88 million, "fulfilling their funding obligations" (*id.* ¶ 21), but that Coastal and Fields failed to pay the Toussies despite receiving tens of millions from the casinos. (*Id.* ¶ 22.) In response, the Toussies filed a lawsuit against Coastal and Fields in New York State Supreme Court, which ultimately resulted in a second agreement, the "Settlement Agreement," which was executed in February 2006. (*Id.* ¶¶ 23–24.) Under the Settlement Agreement, Coastal and Fields agreed to pay the Toussies more than $10.6 million in payments that were then due under the Participation Agreement. (*Id.* ¶ 24.) Notably, the Settlement Agreement included "a provision requiring the parties to resolve any further disputes regarding the Toussies' rights under the Participation Agreement via arbitration." (*Id.* ¶ 25.) Thereafter, in April 2007, Power Plant and the Seminole Tribe also entered into a settlement agreement to resolve certain disputes between them. (*Id.* ¶ 26.) Under that settlement agreement, the Seminole Tribe allocated some revenues from the casinos, referred to as "Tranche B" payments, to be paid to Power Plant monthly until April 2029; Plaintiff alleged that these payments were set at $925,000 per month, to which Coastal was entitled to 45%. (*Id.* ¶¶ 28–32.)

Over time, Coastal and Fields became overextended financially, such that they "could not keep up with their obligations." (*Id.* ¶¶ 33–34.) For example, they fell into

default on a nearly $30 million loan from Bank of America that they had taken out to purchase a ranch in Wyoming. (*Id.* ¶ 34.) As a result, Coastal and Fields restructured their debt to Bank of America in 2012, pledging the Tranche B payments, which pledge was secured by a UCC-1 security agreement. (*Id.* ¶¶ 36–37.) According to Plaintiff, Coastal instructed Power Plant to deposit all of Coastal's distributions, including the Toussies' share, to a lockbox account at Bank of America, which Coastal concealed from the Toussies. (*Id.* ¶¶ 40–41.) From there, Coastal and Fields' financial outlook continued to worsen, and, in or about October 2015, they stopped making payments to the Toussies. (*Id.* ¶¶ 42–48.) Starting in November 2015, the Toussies initiated the litigation that underlies the claims in this case (referred to herein as the "Coastal Litigation") and thereafter hired Defendants to represent them in connection therewith. (*Id.* ¶¶ 50–54.)

The Coastal Litigation led to arbitration (the "Coastal Arbitration") and, ultimately, the entry of a New York State Supreme Court judgment in favor of the Toussies in the amount of $7,857,642.50 on July 17, 2017 (the "Judgment"). (*See id.* ¶¶ 55–104.) "In furtherance of the attempts of the parties to the Coastal Litigation to settle the matter," Plaintiff alleges that there were settlement discussions, during which a significant secured creditor of Coastal and Fields that had purchased their debt to Bank of America (referred to herein as "Stabilis" or the "Stabilis Fund IV") made an offer that could have led to a settlement by which the Toussies would have received payments from Coastal in an amount not to exceed $41,470.56 per month until April 2029. (*Id.* ¶¶ 96, 115; *see also id.* ¶ 63 (stating that Stabilis arranged to purchase the debt owed to Bank of America by Coastal and Fields in June 2016, while the Coastal Arbitration was still pending).)

Plaintiff claims that Defendants learned a number of things during the Coastal Arbitration, including (1) the terms of the Stabilis agreement, "which included that Fields and Coastal had pledged all of their current and future assets to the satisfaction of the Stabilis[] debt" (*id.* ¶ 68); (2) that the Stabilis debt was secured by UCC-1 financing statements (*id.* ¶ 69); and (3) "that Stabilis was claiming to be owed in excess of 80 million dollars[,] all of which was secured by the UCC-1 Financing Statements that had previously been filed by Bank of America." (*Id.* ¶ 70.)

Plaintiff also alleges that Defendants "failed to advise the Plaintiff of the significance of [the Stabilis settlement] offer . . . [,] failed to explain the significance of their fee claims to the [settlement] negotiation, [and] failed to give sufficient concrete advice on this offer." (*Id.* ¶ 99.) Plaintiff further contends that Defendants "failed adequately to advise the Plaintiff on the effect of and on how to choose the relief he sought and that if he elected to reject the [Stabilis] settlement offer his Participation Interest [flowing from the Participation Agreement] would terminate." (*Id.* ¶ 100.) In addition, Plaintiff claims that Defendants rendered deficient advice on the future collectability of his claims if he rejected the Stabilis settlement offer in favor of an entry of judgment due to the superior status of Stabilis's secured debt owed by Coastal and Fields (*see id.* ¶¶ 101–02, 105), which "vastly exceeds the entire revenue stream forecast to be received by Coastal." (*Id.* ¶ 108.) As a result, Plaintiff avers that the Toussies continue to be owed the full amount of the Judgment and that "[u]nder no foreseeable circumstance will a single dollar be collected." (*Id.* ¶ 109.)

## II. Procedural History

On July 16, 2020, Plaintiff commenced this action in New York Supreme Court, Kings County, against Defendants Williams & Connolly LLP ("W&C"), Joseph G.

Petrosinelli, David A. Forkner, and Jonathan E. Pahl (W&C and these defendants are referred to collectively herein as "W&C Defendants"), as well as Defendants Lupkin & Associates PLLC, Jonathan D. Lupkin, and Rebecca C. Smithwick ("Lupkin Defendants" and, collectively with W&C Defendants, "Defendants"), alleging a claim of legal malpractice. (*See* Summons with Notice, ECF No. 1-2 (filed July 16, 2020); State Court Compl., ECF No. 1-3 (filed Sept. 29, 2020).) On December 5, 2020, Defendants removed the case to federal court on the basis of diversity jurisdiction, under 28 U.S.C. § 1332(a). (*See* Notice of Removal, ECF No. 1, ¶ 12.)

After Defendants removed the action to this Court, Plaintiff filed the First Amended Complaint ("FAC") on May 6, 2021. (*See* FAC, ECF No. 35.) On June 1, 2021, W&C Defendants filed an answer (*see* W&C Defs.' Answer, ECF No. 37) and served Plaintiff and his counsel with a motion for sanctions under Federal Rule of Civil Procedure 11 ("Rule 11") based on the allegations in the FAC. (*See* Mot. for Rule 11 Sanctions, ECF No. 45-1; Mot. to Amend, ECF No. 42, at 1–2.) W&C Defendants later filed an amended answer, bringing two counterclaims against Plaintiff based on alleged unpaid attorneys' fees. (*See* W&C Defs.' Amended Answer, ECF No. 39, ¶¶ 166–76.) On June 10, 2021, Lupkin Defendants served a Rule 11 "safe harbor" letter on Plaintiff, seeking sanctions identical to W&C Defendants. (*See* Mot. to Amend, ECF No. 42, at 2 (discussing Lupkin Defendants' safe harbor letter).) Lupkin Defendants also served Plaintiff with a motion to dismiss on June 11, 2021. (*See* Lupkin Defs.' Mot. to Dismiss, ECF No. 38.) After Plaintiff's counsel conferred with counsel for W&C Defendants, on June 23, 2021, Plaintiff moved for an extension of time to file his brief in opposition to Lupkin Defendants' motion to dismiss and sought leave to file a second amended complaint. (*See* Mot. for Extension, ECF No. 40.)

On June 30, 2021, the Honorable Diane Gujarati stayed the briefing schedule for the anticipated motion to dismiss and directed Plaintiff to file a letter brief explaining why leave to amend should be granted, along with the proposed SAC. (*See* June 30, 2021 ECF Order.) On July 7, 2021, Plaintiff filed his letter motion seeking leave to amend. (Mot. to Amend, ECF No. 42.) On July 14, 2021, the two groups of Defendants each filed letter briefs in opposition to Plaintiff's motion, principally arguing that the Court should deny leave to file the proposed SAC because Plaintiff's motion for leave was (i) futile and (ii) proposed in bad faith. (*See* Lupkin Defs.' Opp'n, ECF No. 44, at 4–5 (arguing futility and adopting W&C Defendants' arguments); *see also* W&C Defs.' Opp'n, ECF No. 45, at 3–5 (arguing bad faith and futility).) On October 26, 2021, Judge Gujarati referred the motion to amend to the undersigned magistrate judge. (Oct. 26, 2021 ECF Referral Order.) On January 20, 2022, the Court granted the motion to amend, and directed Plaintiff to file the SAC and Defendants to file their answers. (*See* Jan. 20, 2022 Mem. and Order, ECF No. 46.) Plaintiff filed the SAC, and W&C Defendants filed their answer. (*See* SAC, ECF No. 47; W&C Defs.' Amended Answer, ECF No. 49.) In lieu of filing an answer, Lupkin Defendants filed a letter indicating that they had served Plaintiff a motion to dismiss; that motion was then filed on ECF on March 11, 2022. (*See* Feb. 11, 2022 Letter, ECF No. 48; Lupkin Defs.' Mot. to Dismiss, ECF No. 55.)

Thereafter, on July 8, 2022, W&C Defendants filed a motion for summary judgment. (W&C Defs.' Mot. for Summary J., ECF No. 69.) Meanwhile, discovery had commenced. (*See* Mar. 30, 2022 Minute Entry and Order (discussing the initial conference; setting discovery schedule); Aug. 29, 2022 ECF Order (granting parties' motion to extend time for discovery).) After that, lead counsel for Plaintiff filed a motion to withdraw. (*See* Mot. to Withdraw, ECF No. 81.) To accommodate Plaintiff's search for counsel, the Court temporarily stayed the discovery schedule. (*See* Sept. 9,

2022 ECF Order.) In light of that stay, Judge Gujarati held the motion to dismiss and the motion for summary judgment in abeyance. (*See* Sept. 14, 2022 ECF Order.) After new counsel for Plaintiff entered his appearance, the Court extended the discovery schedule again, and Judge Gujarati ordered that the motions to dismiss and for summary judgment would no longer be held in abeyance; she also referred the motions to the undersigned magistrate judge for a report and recommendation. (*See* Nov. 22, 2022 ECF Order; Nov. 29, 2022 ECF Order.) Following extensive oral argument on July 7, 2023, this Court respectfully recommends that both motions be granted in part and denied in part. (*See* July 7, 2023 ECF Minute Entry and Order.) Specifically, the Court recommends that Plaintiff's breach of fiduciary duty claim be dismissed as duplicative, but that Defendants' motions be denied with respect to Plaintiff's claim of legal malpractice premised on Defendants' alleged provision of negligent legal advice. In addition, the Court recommends that Plaintiff's legal malpractice claim premised on Defendants' failure to object to the award in the Coastal Arbitration be dismissed, as that claim has been abandoned.

## DISCUSSION

### I. Legal Standards

#### A. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, a factual dispute is "genuine" if "'the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). The Court must "view all facts in this case in the light most favorable to the non-movant, resolving all ambiguities in [the non-movant's] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Id.* (alterations and quotation marks omitted).

The movant "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc.*, 875 F.3d at 114 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). Once the moving party has satisfied their burden, "'the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 51 (E.D.N.Y. 2021) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."); *Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 78 (E.D.N.Y. 2019). However, summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).[1]

---

[1] The moving party is also of course required to submit a statement to support their assertion that there are no material facts in dispute. Rule 56(c) provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion

### B. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see id.* ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" (quoting *Twombly*, 550 U.S. at 557)).

On a Rule 12(b)(6) motion, "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). Accordingly, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). In doing so, the court may consider "documents incorporated by reference into the complaint, and matters of which the court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 478 n.18 (2d Cir. 2021).

---

only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## II. Legal Malpractice Claim

The Court first turns to Plaintiff's core legal malpractice claim, which is brought on a theory that Defendants provided negligent advice. Having carefully reviewed the present summary judgment record, the Court concludes that W&C Defendants have not established that they are entitled to summary judgment. Given the complexity of the litigation underlying Plaintiff's allegations, the comparative paucity of the current record as to the legal advice that was provided by W&C Defendants, and drawing all reasonable inferences in Plaintiff's favor, as the Court must in this context, the Court finds that W&C Defendants have not demonstrated that Plaintiff is "unable to prove at least one of the essential elements" of a legal malpractice claim. *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) (quotation marks omitted). For similar reasons, the Court also respectfully recommends denying Lupkin Defendants' motion to dismiss this claim.

### A. Applicable Law

To plead a legal malpractice claim under New York law, "a plaintiff must allege: (1) attorney negligence; (2) which is the proximate cause of a loss; *and* (3) actual damages." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (emphasis in original); *see also Prout v. Vladeck*, 316 F. Supp. 3d 784, 797 (S.D.N.Y. 2018). In turn, to plead attorney negligence, "a party must aver that an attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of [the] profession.'" *Achtman*, 464 F.3d at 337 (quoting *Grago v. Robertson*, 370 N.Y.S.2d 255, 258 (N.Y. App. Div. 3d Dep't 1975)). "An attorney's conduct or inaction is the proximate cause of a plaintiff's damages if 'but for' the attorney's negligence 'the plaintiff would have succeeded on the merits of the underlying action,' or would not have sustained 'actual and ascertainable' damages." *Nomura Asset Cap. Corp. v.*

*Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40, 50 (2015) (citation omitted) (quoting first *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 434 (2007), and then *Dombrowski v. Bulson*, 19 N.Y.3d 347, 350 (2012)).

As a general rule, a complaint that essentially alleges either a mere "error of judgment" or a "selection of one among several reasonable courses of action," does not state a claim for malpractice. *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985). In addition, "[t]he client's mere dissatisfaction" with the attorney's work or strategic choices "cannot support a malpractice claim as a matter of law." *Curtis v. Berutti*, 176 N.Y.S.3d 423, 433 (N.Y. Sup. Ct. 2022); *see Holschauer v. Fisher*, 772 N.Y.S.2d 836, 837 (N.Y. App. Div. 2d Dep't 2004) ("The fact that the plaintiff subsequently was unhappy with the settlement obtained by the defendant does not rise to the level of legal malpractice." (citations omitted)). However, an attorney may be held liable for "ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action." *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 489–90 (N.Y. App. Div. 1st Dep't 1990).

In the context of a legal malpractice claim based on an underlying litigation, "[a] plaintiff's burden of proof in a legal malpractice action is a heavy one. The plaintiff must prove first the hypothetical outcome of the underlying litigation and, then, the attorney's liability for malpractice in connection with that litigation." *Lindenman v. Kreitzer*, 775 N.Y.S.2d 4, 8 (N.Y. App. Div. 1st Dep't 2004). Similarly, to establish a legal malpractice claim based on "the negligent giving of advice," at least one New York court has observed that a plaintiff must establish that the alleged deficient advice caused a different, worse outcome, by showing that "(1) within the context of an attorney-client relationship, (2) the attorney negligently (3) gave improper advice, (4) which was a proximate cause of the client's doing of things he would not otherwise

11

have done, (5) resulting in harm and damage to the client." *Marks Polarized Corp. v. Solinger & Gordon*, 476 N.Y.S.2d 743, 744 (N.Y. Sup. Ct. 1984). An attorney is not negligent in giving advice if that advice is accurate. *See, e.g.*, *Tinter ex rel. Tinter v. Rapaport*, 677 N.Y.S.2d 325, 327 (N.Y. App. Div. 1st Dep't 1998). Nor is an attorney negligent if a plaintiff declines to take their attorney's advice. *Kralik v. Marai*, 189 N.Y.S.3d 181, 182 (N.Y. App. Div. 1st Dep't 2023) (affirming grant of motion to dismiss malpractice claim where "plaintiff opted to pursue arbitration despite defendant's advice regarding the weaknesses of his claims"). Liability also may not attach if an attorney provides the advice "expected of counsel 'exercis[ing] the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession,'" even if the advice recipient does not fully understand how to act on the advice. *Nomura Asset Cap. Corp*, 26 N.Y.3d at 50 (quoting *Dombrowski*, 19 N.Y.3d at 350) (modification in *Nomura*).

Legal malpractice claims may also be based on loss of a settlement opportunity. Proximate cause is still required; a plaintiff will not prevail, even if an attorney goes so far as to fail to communicate a settlement offer to their client, if the plaintiff cannot establish that the attorney's deficient performance proximately caused damages. *See Rubenstein & Rubenstein v. Papadakos*, 295 N.Y.S.2d 876, 877 (N.Y. App. Div. 1st Dep't 1968) (per curiam) ("While a failure to disclose an offer of settlement and submit to the client's judgment for acceptance or rejection is improper practice and could under certain circumstances constitute a defense to an action for legal services, it does not in and of itself give a right to affirmative relief."). However, absent a "concrete settlement offer . . . damages sustained [a]re necessarily too speculative to be recoverable." *Oppenheim & Co., P.C. v. Bernstein*, 604 N.Y.S.2d 62, 63 (N.Y. App. Div. 1st Dep't 1993).

"For a defendant in a legal malpractice case to succeed on a motion for summary judgment, evidence must be presented in admissible form establishing that the plaintiff is unable to prove at least one of the essential elements." *Rubens*, 387 F.3d at 189 (quotation marks omitted). Consistent with *Celotex*, however, in order to survive summary judgment, "the plaintiff in a malpractice case cannot rest on his 'allegations of what [he] views as deficiencies in defendant's conduct as his attorney,' but must offer 'evidence to establish the standard of professional care and skill that [defendant] allegedly failed to meet.'" *Hatfield v. Herz*, 109 F. Supp. 2d 174, 179 (S.D.N.Y. 2000) (quoting *Thaler & Thaler v. Gupta,* 617 N.Y.S.2d 605, 606 (N.Y. App. Div. 3d Dep't 1994)). Accordingly, "[e]stablishing negligence generally requires expert opinion evidence." *Rhee-Karn v. Lask*, No. 15-CV-9946 (DLC), 2020 WL 1046595, at \*5 (S.D.N.Y. Mar. 4, 2020), *aff'd*, 2022 WL 619695 (2d Cir. Mar. 3, 2022); *see also Merlin Biomed Asset Mgmt., LLC v. Wolf Block Schorr & Solis-Cohen LLP*, 803 N.Y.S.2d 552, 553 (N.Y. App. Div. 1st Dep't 2005) (observing that expert testimony may be needed when a legal malpractice claim "raises issues regarding the standard of care of an attorney" that are "not part of the jurors' ordinary, daily experience"). However, the expert evidence requirement "may be dispensed with where ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service." *Est. of Nevelson v. Carro, Spanbock, Kaster & Cuiffo*, 686 N.Y.S.2d 404, 405–06 (N.Y. App. Div. 1st Dep't 1999) (quotation marks omitted).

## B. W&C Defendants' Motion for Summary Judgment

### 1. *The Record is Unclear on Plaintiff's Negligent Advice Claim*

Plaintiff's key negligent advice allegations center on the claim that Defendants failed to advise him adequately on the choice between pursuing efforts to enforce the Judgment in the Coastal Litigation or efforts to settle with creditors of Coastal and

Fields. (*See* Pl.'s Opp'n to W&C Mot., ECF No. 73, at 31; Oral Arg. Tr., ECF No. 112, at 54:25–55:2 (Plaintiff's counsel arguing that Toussie's affidavit indicates that "he would have settled even at a discount if he had known to a near certainty that the judgment was uncollectible").) Accordingly, at the heart of this dispute are questions of whether Defendants negligently failed to advise Plaintiff of the difficulty of collecting on the Judgment in light of other secured creditors against Coastal and Fields, and whether these failures caused Plaintiff to forgo pursuing settlement discussions, by which, he alleges, he could have obtained a monthly income stream.[2] (*See generally* SAC, ECF No. 47, ¶¶ 111–15.) In support of their motion for summary judgment, in addition to the Rule 56.1 statement, W&C Defendants have submitted numerous exhibits, which include, among other things, documents from the Coastal Litigation and emails between Defendants and the Toussies. The parties largely do not dispute the authenticity of these documents. (*See generally* Pl.'s Response to W&C Defs.' Local Rule 56.1 Statement of Undisputed Facts in Supp. of Mot. for Summary J. ("Pl.'s Response"), ECF No. 74.) But there are sharp disagreements about what these documents mean and what inferences may be drawn from the record.

In opposition to the motion for summary judgment, Plaintiff filed an affidavit, an expert declaration, and a Rule 56.1 counterstatement, which includes objections to W&C Defendants' Rule 56.1 statement. (Toussie Aff., ECF No. 76; Michelen Decl., ECF No. 77; Pl.'s Response, ECF No. 74.) These documents illustrate various material facts in dispute. For example, in Plaintiff's affidavit, Toussie avers that Defendants "never

---

[2] As set forth in the SAC, Plaintiff alleges that Defendants (1) did not do enough research or analysis regarding the collectability of the Judgment and the seniority of other liens or creditors to whom Coastal was (or is) indebted to, and (2) gave advice that was negligent. (*See* SAC, ECF No. 47, ¶¶ 111–12 ("[Defendants] failed to give complete, clear and unequivocal advice on collections and the potential success or failure for any particular strategy of collections . . . .").)

14

explained the significance of the Security Agreement that Fields/Coastal entered into with the Bank of America" and that they failed to advise him that "a security agreement made in 2012 could eventually render a judgment obtained against Fields/Coastal uncollectible and of no value." (Toussie Aff., ECF No. 76, ¶ 6; *see also* Pl.'s Response, ECF No. 74, ¶ 45 (citing Ex. 7 of W&C Defendants' exhibits on summary judgment and Toussie Aff.).)[3] Plaintiff also avers that Defendants "never discussed the significance of the UCC Financing Statement dated 2/17/2012 against Coastal" and that they "never explained to [him], nor gave [him] advice that a UCC Financing Statement filed in 2012 could eventually render a judgment obtained against Fields/Coastal uncollectible and of no value." (Toussie Aff., ECF No. 76, ¶ 7; Pl.'s Response, ECF No. 74, ¶ 46 (citing to Ex. 8 of W&C Defendants' exhibits on summary judgment and Toussie Aff.).)

In response to both of these assertions, W&C Defendants respond somewhat conclusorily that Plaintiff has not identified any material issues of fact for trial.[4] (W&C

---

[3] The first thirty pages of Plaintiff's response to W&C Defendants' Local Rule 56.1 Statement lists the same facts as listed by W&C Defendants, and then notes if Plaintiff disputes W&C Defendants' fact statement. (Pl.'s Response, ECF No. 74.) Starting on page 31, Plaintiff lists his own statement, to which W&C Defendants responded in their counterstatement to Plaintiff's. (*See id.* at 31; W&C Defs.' Response to Pl.'s 56.1 Counterstatement ("W&C Response"), ECF No. 79.)

[4] W&C Defendants argue that Plaintiff has failed to identify any material facts in dispute, rejecting, for example, that Defendants' alleged failures to adequately advise him as to the significance of secured creditors and the possible ramifications of the UCC financing statements present genuine issues of material fact as to attorney negligence. In support, W&C Defendants' 56.1 counterstatement cites *Rhee-Karn v. Lask* approximately 27 times for the proposition that "where attorney warned of risk of filing federal action, cannot be held liable for 'fail[ure] to explain[] the intricacies of the law supporting [her] advice' not to file action." (W&C Defs.' Response, ECF No. 79, *passim* (quoting *Rhee-Karn v. Lask*, No. 15-CV-9946 (DLC), 2020 WL 1046595, at *6 (S.D.N.Y. Mar. 4, 2020), *aff'd*, 2022 WL 619695 (2d Cir. Mar. 3, 2022)).) W&C Defendants' heavy reliance on *Rhee-Karn* is misplaced. In that case, in which the plaintiff alleged legal malpractice against her attorney relating to the decision to file a federal case, there was no dispute that the attorney had repeatedly advised her against filing the action. Against that backdrop, the court found that failing to advise as to all of the reasons underlying that recommendation (including, for example, the fairly esoteric *Younger* abstention doctrine) was not malpractice. *See Rhee-Karn*, 2020 WL 1046595, at *6. In this case, Plaintiff disputes whether

Response, ECF No. 79, at 22, 23.) W&C Defendants also represent that they "repeatedly informed Plaintiff that there were risks inherent in enforcing judgment due to the existence of secured lenders." (*Id.*) In support of their position, W&C Defendants primarily marshal the following evidence:[5]

- an email from April 27, 2017, by which Defendant Pahl of W&C forwarded to the Toussies a letter from counsel for a creditor of Coastal and Fields, which states that the "Toussies' 'refusal to accept a lien to secure the Toussie Seminole cash flow plus legal fees' may have 'adverse consequences' including that '[a]ny foreclosure actions on assets . . . will result in significantly decreased recovery from any sale in foreclosure and less funds available to pay a judgment as numerous creditors have security interests in those assets and such a judgment would be subordinate to those interests'" (W&C Defs.' Response, ECF No. 79, at 22, 23 (alteration in original) (quoting W&C Ex. 41, ECF No. 72-41, at ECF p. 4));

- an email sent May 3, 2017, in which Defendant Pahl advised Toussie that "'[i]f Coastal/Fields and their lenders are to be believed, there is a significant risk you could go through the entire process [enforcing judgment], add substantially to your costs and fees, and recover nothing'" (*id.* at 22, 23–24 (alteration in original) (quoting W&C Ex. 44, ECF No. 72-44, at ECF p. 3));

---

his attorneys advised him at all as to certain, more specific, risks relevant to his determination as to how to evaluate the possibility of settlement, as set forth above, and whether those failures constituted legal malpractice.

[5] In addition, at oral argument W&C Defendants proffered an email chain spanning from April 3 through April 17, 2017, which they contend illustrates that Plaintiff was against settling. (*See* W&C Ex. 38, ECF No. 72-38; Oral Arg. Tr., ECF No. 112, at 19:4–21:10.) This email chain, which includes back and forth between attorneys and the Toussies, illustrates the Toussies' resistance to settling at that time, but does not, on its face, detail any specific legal advice that Defendants provided. (*See* W&C Ex. 38, ECF No. 72-38 (showing that (1) Defendant Pahl of W&C emailed the Toussies noting that "Coastal and Fields have filed papers asking to supplement the record with a letter from their lender offering to grant you a security interest in $41 K per month of stream payments," (2) Michael Toussie replied "We don't want a lien . . . we OWN it. It is our property"; (3) Defendant Forkner of W&C replied to the Toussies, offering a settlement proposal to suggest to Justice Ramos: "Fields/Coastal pay all of your attorney's fees and, going forward, you be paid directly by Power Plant without any of your property ever flowing to Coastal/Fields and/or their lenders/creditors. In short, be paid directly by Power Plant and not have to deal with Coastal/Fields again. Assuming this second scenario were possible, is it something to which you would be agreeable?"; and (4) Plaintiff replying, in substance, that it is disappointing that his attorneys had no other recommendations other than to capitulate.)

· a July 5, 2017 email, which Defendant Petrosinelli of W&C forwarded to Toussie, in which "counsel for Coastal/Fields' creditors reported that the foreclosure sale of Fields' ranch was 'not certain to cover [one Coastal/Fields' creditor] let alone others'" (*id.* at 22, 24 (alteration in original) (quoting W&C Ex. 46, ECF No. 72-46, at ECF p. 3)); and

· a July 19, 2017 email from Defendant Petrosinelli to Toussie, in which he wrote that counsel for Coastal and Fields "stated that '[Plaintiff] can't collect on the judgment because the only significant asset . . . is already pledged to lenders, etc.'" (*id.* at 22–24) (quoting W&C Ex. 50, ECF No. 72-50, at ECF p. 2)).

Notably, these four exhibits are identified in response to approximately 13 paragraphs of Plaintiff's Rule 56.1 counterstatement (some of which, according to W&C Defendants, are arguably duplicative), in response to variously-styled assertions by Plaintiff that Defendants had not properly advised him of, *inter alia*, the difficulties of enforcing the Judgment, the priority status of certain of Coastal and Fields creditors, and the impact of various UCC-1 filing statements. (*See* W&C Defs.' Response, ECF No. 79, ¶¶ 45, 46, 58, 79, 81, 101–07, 110.) These four exhibits show that information was provided to the Toussies, to be sure, but the Court cannot conclude, as a matter of law, that they provide advice consistent with the standards of the legal profession about various complex questions in the underlying Coastal Litigation and the prospect of recovering on the Judgment. W&C Defendants counter with the argument that their advice was not negligent because they did advise the Toussies that the Judgment may be unenforceable because it would be subordinate to other secured lenders and that Coastal and Fields' assets would be insufficient to cover these debts, and, moreover, that they did not and could not have known about Coastal and Fields' assets and liabilities at the time they provided their legal advice, in part because they had not had an opportunity to take discovery from Fields. (*See* W&C Defs.' Reply, ECF No. 78, at 3–4; *see also* Arbitrator's Award, W&C Ex. 1, ECF No. 72-1, ¶ 60 & n.12.)

The Court observes, however, that as to three of the key emails set forth above, upon which W&C Defendants repeatedly rely in support of the motion for summary judgment, the emails provided the Toussies with information or opinions offered *by counsel for other parties*. (*See* W&C Exs. 41, 46, 50; *see also* Oral Arg. Tr., ECF No. 112, at 75:18–19 (Plaintiff's counsel arguing that "forwarding a letter from an adversary is not the same as providing legal advice").) The record, as currently developed, does not illustrate that Defendants adopted these attorneys' views as their own, or that they advised Toussie that these other attorneys were correct. Putting a client on notice of information is not necessarily the same thing as providing legal advice, without more context to the conversations that occurred before and after these emails. Perhaps such evidence exists, but it is not apparent from the email trail in the summary judgment record. As the First Department recently observed, "Defendants' email attaching a marked-up copy of the relevant [legal document] does not establish as a matter of law that defendants advised plaintiff as to the meaning of the amendment" to the document. *Alrose Steinway, LLC v. Jaspan Schlesinger, LLP*, 169 N.Y.S.3d 260, 261 (N.Y. App. Div. 1st Dep't 2022); *see id.* (concluding that issues of fact existed as to each element of the plaintiff's legal malpractice action and rejecting the defendants' contention that the provision of a document via email to their client's representative, a "sophisticated businessman," illustrated that the attorneys were not negligent as a matter of law). The First Department's analysis applies with equal force here. Attaching documents to emails with no further explication of their content or meaning does not establish as a matter of law that Defendants advised Plaintiff of the meaning of the documents or provided appropriate legal advice in connection with them.

For example, regarding the April 27, 2017 email, by which Defendant Pahl forwarded a letter from one of Coastal and Fields' creditors, the body of the email

makes no reference to the attached letter. (*See* W&C Ex. 41, ECF No. 72-41, at ECF p. 2.) The email neither instructs the Toussies to read the attachment nor does it state that Defendants agreed with the letter's analysis. (*Id.*) Rather, the cover email provided an update that the arbitration award had been confirmed and outlined next steps, including asking the court to enter judgment. (*Id.* at ECF p. 2.) The email further stated as follows:

> Coastal and Fields' secured lender has said it will begin seizing assets once judgment is entered. That threat of course gives us additional leverage. Now is the time for Coastal/Fields to put their best offer on the table if they want to resolve this matter. We understand that your preference to date has been to proceed to judgment enforcement. But, as we have discussed, there are risks in doing so. We should set up a time early next week to discuss our strategy going forward. Please let us know your availability.

(*Id.*) Undoubtedly, this email informs Toussie that there are "risks" in proceeding to enforcement of the Judgment and implies that the parties have discussed these risks. In addition, shortly thereafter, Defendant Pahl sent the May 3, 2017 email, which offered an overview to the Toussies of "two primary options," i.e., pursuing judgment enforcement or pursuing a settlement. (W&C Ex. 44, ECF No. 72-44.) The May 3, 2017 email reads as follows:

> Bob & Michael:
>
> As you know, Justice Ramos confirmed the arbitration award last week. The award is for nearly $6.7 million, representing the present value of your portion of the Seminole stream payments, plus slightly more than $800K to compensate you for attorneys' fees incurred through the end of the arbitration. Here are the two primary options we see and some likely milestones for each:
>
> **Option 1: Pursue judgment enforcement**
>
> - The order confirming the award will be "settled" and judgment entered. That process will take several months.
>
> - Coastal and Fields have said they will appeal the judgment.

- An appeal can take substantial time - perhaps a year or longer.
- Coastal/Fields would ask the appellate court to reverse Justice Ramos' order and vacate the arbitration award.
- The appeal will add to your legal bills.

- Ed Wallace has said Coastal/Fields will not post an appeal bond, so judgment collection efforts would begin.[6]

- With a judgment of this size, Coastal/Fields' lender(s) could declare a default.
  - Upon a default, a race to seize assets would begin. That race might proceed in bankruptcy; it might not.
  - You would stop receiving the $41K you receive per month.

- With a judgment, you would get discovery into Coastal/Fields' assets but would have to pay lawyers to investigate.
  - You would have to pay lawyers to pursue the assets, perhaps in multiple jurisdictions, and then collect.
  - The structure of Coastal/Fields' corporate hierarchy could hinder your efforts to collect the judgment.
  - You could pursue legal action against other creditors and banks, but doing so would be costly and the outcome uncertain.

- The appeal could complicate judgment collection, delaying any recovery (if any) and adding to your costs.

- To recover legal fees incurred since the arbitration (and those going forward), you would have recourse only to the Fields' guaranty.
  - That guaranty may not be worth much if he defaults.
  - You may need to initiate a new legal proceeding to obtain those fees. That proceeding may or may not be successful.

- If Coastal/Fields and their lenders are to be believed, there is a significant risk you could go through the entire process, add substantially to your costs and fees, and recover nothing.

**Option 2: Use your leverage to pursue a favorable settlement**

- Ideally, the settlement would need to have the following elements:

---

[6] From the summary judgment record, it is somewhat difficult to discern who Ed Wallace is, or precisely how he fits into the picture. According to W&C Defendants' counsel at oral argument, he was an attorney who represented an individual who had "some interest in a Wyoming property," i.e., he was a lawyer for one of the creditors for Coastal and Fields. (Oral Arg. Tr., ECF No. 112, at 9:16–20.) At oral argument, counsel for Plaintiff agreed that Ed Wallace was a lawyer for one of the creditors, adding that Mr. Toussie "hired a top law firm to give him advice. He didn't hire them to hear what his adversary's lawyers had to say." (*Id.* at 84:8–10.)

- o  You would receive your monthly payments directly from Power Plant.
- o  You would be paid your attorney's fees.
- o  You would become a *secured* creditor with rights to seize your portion of the stream upon future defaults - and Coastal and Fields' secured lender (Stabilis) would recognize the validity of your interest.

- In light of the order confirming the arbitration award, we might seek other terms, possibly including:
  - o  Asking for the $7,500 per month that you gave up in the last iteration of the dispute[.]
  - o  Trying to obtain pre-judgment interest on the arbitration award.
  - o  Seeking carve-outs from the settlement to allow you to pursue claims against certain entities.

Based on what we know, Option 2 provides a clearer path forward. It would allow you to receive your payment stream directly from Power Plant, thus separating yourselves from Coastal and Fields. Coastal/Fields' secured lender would recognize the validity of your interest. Both of those developments would substantially improve your position over where you were in October 2015 when this began. Furthermore, you would recover your attorneys' fees.

. . . .

We look forward to speaking tomorrow morning at 10:30.

(*Id.* (emphasis in original).) Shortly after that email, on May 4, 2017, the Toussies had a

call with three of the attorney Defendants, Messrs. Forkner, Pahl, and Lupkin; Mr. Pahl

sent himself an email on May 5, 2017, summarizing his recollection of the call, to which

Plaintiff objects. (*See* W&C Ex. 45, ECF No. 72-45; Pl.'s Response, ECF No. 74, at 23.)

Notably, the current summary judgment record is incomplete as to the parties'

recollections regarding this call. Plaintiff's counsel noted at oral argument that all

participants in the conversation have been deposed and Plaintiff contends that there is a

"factual dispute, not just by [Plaintiff] but [also] from [Plaintiff's] brother, concerning what happened in that call." (Oral Arg. Tr., ECF No. 112, at 58:22–59:4.)[7]

On the basis of the present record, the Court finds that these exhibits, which Defendants repeatedly cite,[8] do not demonstrate that Plaintiff cannot, as a matter of law, establish negligent provision of advice as to important matters underlying the Coastal Litigation and related questions. Unfortunately, the summary judgment record, as currently developed, does not establish with clarity who knew what when with regard to Coastal and Fields' indebtedness and the possibility of recovering assets to enforce the Judgment.[9] Plaintiff points out, for example, that on March 9, 2017, Defendant Pahl

---

[7] W&C Defendants argue that this exhibit is admissible under the hearsay exception for business records. (Oral Arg. Tr., ECF No. 112, at 17:17–22.) Plaintiff argues that this document is inadmissible hearsay. Although this email was drafted reasonably close in time to the phone call, the admissibility of this email cannot be assumed without further explication of the circumstances of this email's creation and whether it qualifies as a summary of the "regularly conducted activity of a business." *See* Fed. R. Evid. 803(6). Given that there appear to be factual disputes regarding the contents of this phone call and uncertainty as to whether Mr. Pahl's summary is admissible under the business records exception, the Court does not consider this exhibit for purposes of the motion. The Court further notes that W&C Defendants confirmed at oral argument that this email was never shared with the Toussies prior to this litigation. (Oral Arg. Tr., ECF No. 112, at 17:25–18:10.)

[8] In response to Plaintiff's Rule 56.1 counterstatement, Defendants rely upon the letter included in the April 27, 2017 email dozens of times in support of the proposition that Toussie was advised that his Judgment, if entered, would be subordinate to other creditors' claims against Coastal and Fields, and that "[a]ny foreclosure actions on assets . . . will result in significantly decreased recovery from any sale in foreclosure and less funds available to pay a judgment, as numerous creditors have security interests in those assets and such a judgment would be subordinate to those interests." (*See* W&C Defs.' Response, ECF No. 79, *passim* (quoting W&C Ex. 41, ECF No. 72-41).) As discussed *supra*, this information and these opinions were offered by counsel for creditors of Coastal and Fields, not Defendants, as counsel to Toussie. (*See* Oral Arg. Tr., ECF No. 112, at 23 (W&C counsel confirming that the author of the letter represented "creditors").)

[9] The Court notes that Plaintiff has taken the position that W&C Defendants' motion for summary judgment is premature. The Court further notes that the rule cited in support of this proposition, former Rule 56(f), is no longer in effect, and that Plaintiff has not filed an appropriate affidavit under Rule 56(d). (Pl.'s Opp'n to W&C Mot., ECF No. 73, at 28–29; Pl.'s Ltr., ECF No. 109.) *See generally* Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendment (observing that "Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)"). At oral argument, Plaintiff again requested the

sent Defendant Forkner an email stating that, at a mediation, the judge was "working on Michael [Toussie] to convince him there will be no recovery and all assets are spoken for." (W&C Ex. 26, ECF No. 72-26, at ECF p. 2; *see* Toussie Aff., ECF No. 76, ¶ 16.) Plaintiff states in his affidavit that "Mr. Pahl never explained to me that there could be 'no recovery and all assets are spoken for.'" (Toussie Aff., ECF No. 76, ¶ 16 (quoting W&C Ex. 26, ECF No. 72-26, at ECF p. 2).) Given his brother Michael's participation in the mediation, it is entirely possible that Plaintiff knew this information, and that, against that backdrop, the Defendants' communications with Toussie provided reasonable legal advice. A trier of fact could also conclude, however, that the May 3, 2017 email suggests a rosier prospect of recovery than that anticipated by W&C Defendants, based on what they had learned during the arbitration. (*See* W&C Ex. 44, ECF No. 72-44 (proposing "two primary options" for moving forward).)

As illustrated throughout this analysis, the representation underlying this case involved a complex series of transactions and many discussions between the attorneys and their clients. Whether the advice W&C Defendants provided during this multi-month discussion about seeking judgment enforcement or settlement was consistent with the "ordinary and reasonable skill and knowledge commonly possessed by a member" of the legal profession is a fact-intensive inquiry.[10] *Achtman*, 464 F.3d at 337.

---

opportunity to supplement the record, which the Court denied due to counsel's failure to file a Rule 56(d) affidavit, and also due to the length of time the motions have been pending. (Oral Arg. Tr., ECF No. 112, at 109.)

[10] The Court is of course cognizant of the cases holding that "'[a]n attorney . . . is not held to the rule of infallibility, and is not liable for an honest mistake of judgment where the proper course of action is open to reasonable doubt.'" *Hatfield v. Herz*, 109 F. Supp. 2d 174, 180 (S.D.N.Y. 2000) (quoting *Est. of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 921 (S.D.N.Y. 1997)); *see also Katsoris v. Bodnar & Milone, LLP*, 131 N.Y.S.3d 89, 91 (N.Y. App. Div. 2d Dep't 2020) ("[T]he Court of Appeals has recognized, as a matter of law, that '[the] selection of one among several reasonable courses of action does not constitute malpractice.'" (quoting *Rosner v.*

Indeed, as the Second Circuit has observed, typically, in a case involving an underlying litigation, "[t]he questions to be resolved by the fact-finder in [a] legal malpractice action . . . are whether the lawyer fell below the applicable standard of care, and if so, whether a reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence." *Rubens*, 387 F.3d at 189. The settlement context is of course somewhat different, but the same core question must be answered: whether the lawyer's advice with respect to settlement fell below the applicable standard of care. In response to W&C Defendants' summary judgment motion, Plaintiff has submitted an affidavit, an expert opinion that the standard of care was not met here, and states that he would have settled had he known that there was a high likelihood that he would not have been able to recover on the Judgment.[11] There are genuine, material issues of fact in dispute.

---

*Paley*, 65 N.Y.2d 736, 738 (1985))). On the present record, questions of what W&C Defendants knew about the uncollectability of the Judgment, whether W&C Defendants made an honest mistake, or whether the two main outcomes discussed here were each a "reasonable course[] of action" are facts in dispute. *Rosner*, 65 N.Y.2d at 738.

[11] W&C Defendants contend that the Court should not place any weight on the expert report, contending that it parrots Toussie's allegations and that there is "'too great an analytical gap'" between the materials relied upon and the expert's conclusions. (W&C Defs.' Reply, ECF No. 78, at 6 n.12 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 270 (2d Cir. 2002).) Given the Court's conclusion that the summary judgment record illustrates that there are material facts in dispute, the Court respectfully recommends declining to reach the issue of how to evaluate the expert report and the anticipated expert testimony in this case until and unless there is a *Daubert* hearing, where these issues can be fully addressed. For purposes of this opinion, the Court does not rely on the expert's declaration, but merely notes that Toussie has come forward with anticipated expert testimony. The Court also notes that the parties mentioned at oral argument that an additional Plaintiff's expert has been noticed during the ongoing expert discovery. (*See, e.g.*, Oral Arg. Tr., ECF No. 112, at 11:22, 60:7–11, 61:19–21.)

2.  *Proximate Cause & Damages*

The Court now turns to whether W&C Defendants have established that Plaintiff is unable to prove proximate cause and damages.[12] *See Rubens*, 387 F.3d at 189. Interpreting the record in the light most favorable to Plaintiff, the Court finds that there are genuine material questions of fact in dispute as to whether, if Toussie had been more informed about the (low) likelihood of collecting on the Judgment, a settlement could have been reached that would have provided the Toussies with a monthly income stream. W&C Defendants argue that Toussie cannot establish causation because "he admits that [the Stabilis] offer was not binding absent a definitive agreement satisfactory to Stabilis, and has not proffered evidence establishing that such an agreement was negotiated or that issues with the Stabilis Conditional Offer were resolved." (W&C Defs.' Reply, ECF No. 78, at 8 (footnote omitted).)

The record here repeatedly reflects that Defendants communicated with Plaintiff regarding the possibility of settlement. Most significantly, on April 3, 2017, before the Coastal Arbitration was concluded and the Judgment entered, Defendants emailed Plaintiff, stating: "Coastal and Fields have filed papers asking to supplement the record with a letter from their lender offering to grant you a security interest in $41K per

_____

[12] Relying on *Estate of Ginor v. Landsberg*, 960 F. Supp. 661 (S.D.N.Y. 1996), W&C Defendants argue that, "[a]s the party with the burden of proof at trial, Toussie must identify 'evidence sufficient to establish each element of [his] case.'" (W&C Defs.' Reply, ECF No. 78, at 8 n.14 (quoting *Estate of Ginor* and citing *Celotex*).) *See generally Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986) (observing that Rule 56 mandates the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial"). At the same time, the Court is mindful of the Second Circuit's observation that, to succeed on summary judgment in a legal malpractice action, a defendant must present evidence to establish that the plaintiff cannot prove one of the three essential elements of the claim. *Rubens*, 387 F.3d at 189. As discussed herein, drawing all reasonable inferences in Plaintiff's favor, the Court finds that W&C Defendants have not established that Plaintiff cannot prove one of the three elements, there are material facts in dispute, and Plaintiff has come forward with evidence in support of his case notwithstanding that the instant summary judgment motion was filed before the completion of discovery.

month of stream payments," and attaching a March 30, 2017 letter from Scott M. Esterbrook. (W&C Ex. 36, ECF No. 72-36, at ECF p. 2; *see id.* at ECF pp. 15–16.) The Esterbrook letter stated: "the Lender is prepared to permit the Defendants to grant Robert and Michael Toussie (the 'Toussies') a *pari passu* lien on the Toussie's participation interest and the payments made by Coastal in accordance therewith in an amount not to exceed $41,470.56 per month, provided that the Toussie Case and any related litigation is concluded in all respects with prejudice." (*Id.* at ECF p. 15.) On April 17, 2017, Defendants emailed Plaintiff, noting "we expect Justice Ramos to ask what it will take to make this matter settle" and suggesting two possible settlement proposals. (W&C Ex. 38, ECF No. 72-38, at ECF p. 2.) Thereafter, the New York Supreme Court entered an order confirming the Award and entering Judgment for the Toussies in an amount of over $7 million on June 17, 2017. (Pl.'s Response, ECF No. 74, ¶ 84 (citing June 17, 2017 Judgment, W&C Ex. 49, ECF No. 72-49).)

On July 5, 2017, Mr. Petrosinelli forwarded to Plaintiff an email from Ed Wallace, counsel for one of the creditors to Coastal/Fields. (W&C Ex. 46, ECF No. 72-46 (forwarding email from Mr. Wallace).) Mr. Wallace's July 5 email noted that foreclosure of Fields' Wyoming ranch was "not certain to cover my client let alone others." (*Id.* at ECF p. 3.) Wallace's email also stated: "Given capped upside, settling now for certain cash today, rather than continuing expensive fighting over capped '*possible*' cash tomorrow makes business sense," encouraging settlement.[13] (*Id.*) On July 19, 2017, Mr.

---

[13] Mr. Petrosinelli also included the following advice in his July 5, 2017 email to Plaintiff: "I propose to call him at some point and say, all this is very interesting, but you need to make an offer, because unless the offer is very close to the current amount owed on everything (judgment, plus additional legal fees and unpaid monthly amounts since judgment), which is about $8M, then is nothing to discuss. If anyone has a problem with that approach, let me know." (W&C Ex. 46, ECF No. 72-46.)

Petrosinelli emailed Plaintiff a summary of a recent call with Mr. Wallace, stating: "I said [to Mr. Wallace] I have no indication whatsoever that $6 million is even in the range of what [Plaintiff] would consider but I would pass along the message." (W&C Ex. 50, ECF No. 72-50, at ECF p. 2.) On July 23, 2017, Mr. Petrosinelli, Plaintiff, and Mr. Wallace "had a call to discuss Toussie's position on settlement." (Pl.'s Response, ECF No. 74, ¶ 86.) "On July 26, 2017, Mr. Wallace informed W&C that he understood that Robert Toussie 'was open to a $500,000 reduction in the judgment to settle,' and said that his 'client and the defendant have authorized me to offer to settle the matter for $5.5 million.'" (Pl.'s Response, ECF No. 74, ¶ 87 (quoting W&C Ex. 52, ECF No. 72-52, at ECF pp. 2–3).) The next morning, Plaintiff wrote back: "'YOU GOT IT RIGHT. NOTHING TO DISCUSS.'" (*Id.* (quoting W&C Ex. 53, ECF No. 72-53, at ECF p. 2).) Further discussions of settlement did not result in a settlement being reached, which ultimately led to Plaintiff hiring new counsel for judgment enforcement.[14]

Given this history, W&C Defendants contend that there were no concrete settlement offers, and that Plaintiff cannot establish causation or actual, ascertainable damages because he repeatedly rejected overtures regarding settlement. (*See* W&C

---

[14]    "On July 29, 2017, W&C emailed Plaintiff to inform him that Mr. Wallace asked whether Plaintiff was 'willing to lower [his] $7.5m number by $375k.'" (Pl.'s Response, ECF No. 74, ¶ 88 (quoting W&C Ex. 54, ECF No. 72-54, at ECF p. 2).) Later on July 29, Plaintiff emailed Mr. Petrosinelli as follows:

> JOE,PLEASE THIS IS THE TIME TO REALLY TAKE ME SERIOUSLY.I REALLY AM THROUGH WITH THIS .I HAVE NOT SEEN A DIME AND I HAVE TO ATTEND TO OTHER THINGS.I AM 76,JOE.PLEASE SHARE THE EMAIL I SENT YOU THAT I AM GOING TO EXECUTE ON THE JUDGEMENT.THAT WILL PROBABLY BE ANOTHER OPPORTUNITY.ALSO,PLEASE TELL HIM YOU TOO HAVE EXHAUSTED THE WELCOME MAT BY BOB TO KEEP CALLING ME ON FIELDS AND WALLACE..IF NOT YOUR STYLE,I WILL DO.PLEASE LET ME KNOW.LOVE YA BOB[.]

(W&C Ex. 55, ECF No. 72-55, at ECF p. 2.)

Defs.' Mot., ECF No. 70, at 24–25; W&C Defs.' Reply, ECF No. 78, at 8; W&C Defs.' Ltr., ECF No. 111, at 2.) More specifically, in their motion, W&C Defendants assert that "Plaintiff knew about the Stabilis Conditional Proposal," and, had he wanted to pursue it, "or any settlement offer," he was free to do so. (W&C Defs.' Mot., ECF No. 70, at 25.) Defendants also argue that because "Plaintiff continued to reject every settlement idea floated," he is precluded from proving "that W&C's conduct was the 'but for' cause of his alleged injury." (*Id.*)

As set forth above, the crux of Plaintiff's claim that there was a concrete settlement offer here is grounded on the proposal outlined in the Esterbrook letter. Under that arrangement, had it come to fruition, Plaintiff would have obtained a "lien on the Toussie's participation interest and the payments made by Coastal in accordance therewith in an amount not to exceed $41,470.56 per month, provided that the Toussie Case and any related litigation is concluded in all respects with prejudice." (W&C Ex. 36, ECF No. 72-36, at ECF p. 15.) Defendants' argument as to the Esterbrook letter is two-fold. First, they contend that Toussie refused to discuss settlement. (W&C Defs.' Mot., ECF No. 70, at 25.) They may be right; the summary judgment record includes several examples of Mr. Toussie flatly refusing to discuss settlement. W&C Defendants also argue that the offer was not "concrete," and may not have come to fruition. (*Id.* at 17; *see id.* at 25.) That is also possible. But according to an email from one of W&C Defendants, the offer appears to have been concrete enough to have been proposed at a mediation. (*See* W&C Ex. 26, ECF No. 72-26, at ECF p. 2 (email from Mr. Pahl to Mr. Forkner stating that "Wallace and the vulture fund are proposing to grant a security interest in 41K a month and have it come from the power plant trust"); *see also* W&C Ex. 38, ECF No. 72-38, at ECF p. 3 (including email from W&C Defendant Pahl to the Toussies stating that "Coastal and Fields have filed papers asking to supplement the

28

record with a letter from their lender *offering* to grant you a security interest in $41K per month of stream payments" (emphasis added)).) Whether this was a concrete offer is a question of fact.

Also as to causation and damages, Toussie avers in his affidavit that "[i]n no document or exhibit presented by Defendants to this motion do Defendants discuss or analyze (other than to mention) the Scott Esterbrook letter. . . . Defendants never, much less adequately, directly discussed this letter or its ramifications with me." (Toussie Aff., ECF No. 76, ¶ 74.) W&C Defendants dispute this claim.[15] Mr. Toussie also represents that he was "never given adequate advice on the actual nature of UCC Financing Statements, liens, senior judgments, or Security Pledges. Had I been given this information, I would not have thought that there was a path forward via a judgment and ending the participation agreement and would have taken the settlement." (Toussie Aff., ECF No. 76, ¶ 18.) Accordingly, Plaintiff has offered evidence that places material facts in dispute as to causation and damages.

## C. Lupkin Defendants' Motion to Dismiss

Lupkin Defendants argue that Toussie has failed to allege attorney negligence in the SAC, and that he cannot establish causation and damages. In their motion to dismiss, Lupkin Defendants cite to a number of exhibits attached to their answer and premise some of their factual arguments on those documents. (*See, e.g.*, Lupkin Defs.'

---

[15] In response to Toussie's statement that Defendants never advised him of the substance of the papers forwarded to him on April 3, 2017, which included the Esterbrook letter, W&C Defendants state: "On April 3, 2017, W&C forwarded the Stabilis Letter to the Toussies, writing in the cover email, 'Coastal and Fields have filed papers asking to supplement the record with a letter from their lender *offering to grant you a security interest in $41K per month of stream payments*.'" (W&C Defs.' Response, ECF No. 79, at 15 (emphasis in W&C Defs.' Response) (citing W&C Ex. 36, ECF No. 72-36).)

MTD, ECF No. 57, at 19 (discussing the content of the Esterbrook letter); 20–22 (quoting emails from Mr. Toussie that are not included in the complaint).)

As a threshold matter, the Court must determine whether consideration of the exhibits discussed in Lupkin Defendants' motion is permitted in this posture or whether Lupkin Defendants' motion should be converted to a motion for summary judgment under Federal Rule of Civil Procedure 12(d).[16] To that end, on June 27, 2023, the Court issued an order observing that the "voluminous documents submitted in support of the motion to dismiss . . . are relevant to the Court's determination," in order to put the parties on notice of the possibility that the motion could be converted to one for summary judgment. (June 27, 2023 ECF Entry and Order.)

In his written responses to the Court's order, Plaintiff indicated an interest in supplementing the record. (*See* Pl.'s Ltr., ECF No. 109.) Lupkin Defendants objected given the length of time the motion has been pending and stating that they do not believe converting the motion is necessary for the Court to decide it, but also noting that, "[t]o the extent that the Court determines that additional submissions from Plaintiff and Lupkin Defendants are needed to determine the Lupkin Defendants' motion to dismiss, we would respectfully request that the Court permit discovery to be completed before submission of supplemental evidence is allowed." (Lupkin Defs.' Ltr.,

---

[16] This is not to say that these documents are irrelevant to whether Plaintiff will ultimately prevail on his claims. Rather, the Court concludes only that the extrinsic documents discussed in Lupkin Defendants' motion are not incorporated into or integral to the complaint. *See Goel*, 820 F.3d at 559 (explaining that "[m]erely mentioning" or "even offering limited quotation[s] from the document is not enough" (quotation marks omitted)).

ECF No. 110, at 2.) Lupkin Defendants further requested that the Court consider denying the motion to dismiss without prejudice to renew on summary judgment.[17]

The Court declines to convert Lupkin Defendants' motion to dismiss to a motion for summary judgment, without prejudice to Lupkin Defendants' raising their arguments on summary judgment when the record is complete. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 573 (2d Cir. 2005) (recognizing that it "is within the discretion of th[e] [c]ourt to convert a motion filed under [Rule] 12(b)(6) into one seeking summary judgment"). The Court also excludes from consideration the documents submitted in support of Lupkin Defendants' motion as they are "matters outside the pleadings," in that they were not expressly incorporated into the complaint. Fed. R. Civ. P. 12(d); *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Ordinarily, a "district court . . . errs when it considers [materials] submitted by defendants . . . on a 12(b)(6) motion to dismiss.'" *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021) (quoting *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000)).

Turning to the substance of Lupkin Defendants motion to dismiss, they advance three main arguments. First, they aver that Toussie's allegations are speculative and conclusory because "the Stabilis Letter was not a settlement offer." (Lupkin Defs.' MTD,

---

[17] At oral argument, Lupkin Defendants took a somewhat different position, stating that they believed that the documents relied upon in their motion were "integral" to the SAC, and that the Court may consider them without converting the motion. (Oral Arg. Tr., ECF No. 112, at 6:25–7:2.) This approach is at odds with the Second Circuit's recent teachings, discussed above. *See supra* note 16. Accordingly, the Court declines Lupkin Defendants' invitation to consider matters outside the complaint.

ECF No. 57, at 19 (discussing Esterbrook letter).) Second, they contend that Toussie fails to allege that he was willing to settle. (*Id.* at 20.) Third, they posit that "even if the Court does not dismiss this claim for being implausible and grossly speculative, Toussie's own words confirm that he had no interest in settlement." (*Id.* at 21 & n.5 (discussing Toussie emails and advancing the argument that they may be considered by this Court) (footnote omitted).)

As discussed above, there is a factual dispute about whether the proposal outlined by Esterbrook was an offer. Similarly, in the context of the motion to dismiss, where the Court must accept all of Plaintiff's factual allegations as true, and draw all reasonable inferences in his favor, the Court cannot grant Lupkin Defendants' motion on this basis without improperly deciding the factual question of whether the Esterbrook letter was an offer. *See Littlejohn*, 795 F.3d at 306. As to whether Toussie has alleged he was willing to settle, the Court notes that paragraph 116 of the SAC states: "'But for' defendants' departures from good practice, Plaintiff would have recovered this amount [monthly payments of $41,470.56 through April 2029] *by settling on these terms which it would have done* with proper advice." (SAC, ECF No. 47, ¶ 116 (emphasis added).) Although it is true that the SAC does not use specific language stating that Plaintiff would have accepted the offer, the plain language of the SAC, drawing all reasonable inferences for the non-movant, adequately alleges that Plaintiff would have settled.[18] The evidence Lupkin Defendants proffer to argue otherwise includes a series

---

[18] For this reason, Lupkin Defendants' arguments based on *Drasche v. Edelman & Edelman*, 156 N.Y.S.3d 733 (N.Y. App. Div. 1st Dep't 2022), are unpersuasive. As an initial matter, the Court notes that the facts of *Drasche* are not on all fours with the allegations in this case. In *Drasche*, the plaintiff claimed that her attorneys received a settlement offer that was never conveyed to her. *Drasche*, 156 N.Y.S.3d at 733–34. As set forth in the SAC, Plaintiff is not claiming he was never informed of a potential settlement, but rather that he received deficient advice on how to evaluate it, and that Defendants also performed negligently in other respects,

of emails that the Court cannot consider in the motion to dismiss posture. (*See* Lupkin Defs.' MTD, ECF No. 57, at 21–23 (citing to various email messages and relying on "Toussie's own words").)

For all of the reasons discussed above, and in the Court's prior decision allowing Plaintiff to file the SAC, the Court finds that Plaintiff has stated a claim on which relief can be granted. Accordingly, the Court respectfully recommends that Lupkin Defendants' motion to dismiss be denied.

### III. Failure to Object to Arbitration Award Claim

In the SAC, Plaintiff alleges that "[t]he Arbitration Award made findings that were contrary to law, in excess of the power of the Arbitrator, contrary to the facts, displaying a manifest disregard of the law refusing to apply lien law," and that Defendants' "failure to object to the findings in the Arbitration Award that Coastal and Fields had pledged the Toussies' portion of the Tranche B Payments to Bank of America to secure the Bank of America, constituted departures from good practice." (SAC, ECF No. 47, ¶¶ 118, 120.) Plaintiff did not substantively respond to either the Lupkin Defendants' motion to dismiss or W&C Defendants' motion for summary judgment as to this claim. (*See* Lupkin Defs.' MTD, ECF No. 57, at 12–18; W&C Defs.' Mot., ECF No. 70, at 18–22; *see generally* Pl.'s Mem. in Opp'n to MTD, ECF No. 59; Pl.'s Opp'n to W&C Mot., ECF No. 73.) At oral argument, counsel for Plaintiff confirmed that this claim has

---

as discussed above. Taking Plaintiff's allegations as true, as the Court must on a motion to dismiss, they state facially plausible "but for" causation as to the damages alleged in the SAC. *See Prout*, 316 F. Supp. 3d at 799. The Court also notes that, in the motion to dismiss, Lupkin Defendants rely upon an email from Plaintiff's brother Michael Toussie, a matter outside the pleadings, in support of their argument that he rejected the Stabilis proposal, and that "Toussie cannot plausibly allege that he would have accepted a hypothetical settlement given his co-plaintiff's written rejection of the offer and Toussie's failure to object to the position." (Lupkin Defs.' MTD, ECF No. 57, at 20.) The Court rejects the Lupkin Defendants' invitation to decide facts on a motion to dismiss.

been abandoned. (Oral Arg. Tr., ECF No. 112, at 11:11–21.) Accordingly, the Court respectfully recommends that this claim be dismissed. *See Conklin v. U.S. Immigr. & Customs Enf't*, No. 20-CV-8178 (LTS), 2023 WL 2537665, at \*15 (S.D.N.Y. Mar. 16, 2023) ("Generally, an argument not addressed in an opposition to a summary judgment motion is considered waived.").

## IV. Breach of Fiduciary Duty Claim

Plaintiff's second cause of action is for breach of fiduciary duty. "Under New York law, the elements of a claim for breach of fiduciary duty are: '(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'" *Schwartzco Enters. v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 352 (E.D.N.Y. 2014) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citations omitted)). "[A] fiduciary relationship exists . . . when one is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 306 (S.D.N.Y. 2014) (modification and quotation marks omitted); *see also Ulico Casualty Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 865 N.Y.S.2d 14, 20 (N.Y. App. Div. 1st Dep't 2008) ("It is axiomatic that the relationship of attorney and client is fiduciary: 'The attorney's obligations, therefore, transcend those prevailing in the commercial market place' . . . .") (quoting *In re Cooperman*, 83 N.Y.2d 465, 472 (1994)).

However, "[u]nder New York law, where a claim for breach of fiduciary duty is 'premised on the same facts and seeking the identical relief' as a claim for legal malpractice, the claim for fiduciary duty 'is redundant and should be dismissed.'" *Nordwind v. Rowland*, 584 F.3d 420, 433–34 (2d Cir. 2009) (quoting *Weil, Gotshal & Manges LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 1st Dep't 2004)). Such is the case here. First, Toussie's theory of liability, that Defendants'

34

negligent advice caused him to lose a viable settlement opportunity, is "common to both the legal malpractice and breach of fiduciary duty" claims. *Weil, Gotshal & Manges LLP*, 780 N.Y.S.2d at 595. Second, the damages alleged in the complaint are identical for both claims. In the SAC, Plaintiff pleads damages in the amount of $7,857,642.59, the same amount as the Judgment, "on each cause of action." (SAC, ECF No. 47, at 24; *see* SAC ¶ 104.) Accordingly, Toussie is not seeking "different or greater relief" for the breach of fiduciary duty claim as compared to the legal malpractice claim, and it should be dismissed as duplicative. *Benjamin Off. Supply & Servs. Inc. v. 2 Crystals Inc.*, No. 20-CV-3693 (JS) (ST), 2021 WL 4813229, at *10 (E.D.N.Y. Aug. 10, 2021), *report and recommendation adopted*, 2021 WL 4129165 (E.D.N.Y. Sept. 10, 2021).[19]

## CONCLUSION

For all of these reasons, the Court recommends granting the Defendants' motions in part and denying them in part. Specifically, the Court recommends (1) dismissal of Plaintiff's legal malpractice claim insofar as it was styled as a failure to object to the arbitration award, as that claim has been abandoned; and (2) dismissal of Plaintiff's fiduciary duty claim as duplicative. The Court recommends denying the motions as to Plaintiff's negligent advice claim as set forth above, without prejudice, given that discovery is still ongoing.

\*    \*    \*    \*    \*

---

[19] In Plaintiff's response to the W&C Defendants' motion for summary judgment, Toussie argues that the fiduciary duty claim is different because the damages "arise from the unnecessary legal fees paid to the defendant." (Pl.'s Opp'n to W&C Mot., ECF No. 73, at 38; *see also id.* at 38 (discussing "disgorgement of legal fees").) The SAC does not differentiate between the alleged damages, however, and "a party is not entitled to amend its complaint through statements made in motion papers." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (citing *IIT v. Cornfeld*, 619 F.2d 909, 914 n.6 (2d Cir. 1994), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)).

Objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Diane Gujarati, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g., Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated:    Brooklyn, New York
          July 26, 2023

*Taryn A. Merkl*

TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE